# Abercrombie & Williams *v.* Vandiver.

126  513
127  509

*Action upon a Contract.*

1. *Contract for building railroad; construction thereof.*—Where, in the construction of a railroad, time in the completion of the road is expressly made of the essence of the contract, and the contractor agrees to accept, as so much cash in payment of the work, a certain amount of notes given as subscription bonus in consideration of the building of the said railroad, the payment of which notes is conditioned upon the completion of the road to a point within the corporate limits of a designated city or town within the time specified in the contract, and it is expressly agreed that no liability should attach to the other party to the contract for the failure of the contractor to collect any of said subscription bonus notes in the event the road was not completed to a point in the corporate limits of said town within the time specified for the road to be built, the fact that after the expiration of the time so limited in the contract for the completion of the road, the line of location was changed by the other party to the contract, so as not to pass through the corporate limits of said designated city or town, does not give the contractor the right to tender back the subscription bonus notes received by him and receive their equivalent in money; since the change in the location of the road having been made after the contractor had made default as to the time limit of the contract, the loss, if any, resulting from failure to collect the subscriptions must fall upon him.

2. *Same; same; claim for extra work.*—Where, in a contract for the construction of a railroad, it is stipulated that "no claim for extra work will be considered except it be made in writing to the resident engineer within one month after said work has been done," the making of a claim in the manner stipulated is a condition precedent to the right of the contractor to claim compensation for extra work done in the construction of the railroad; and the fact that such extra work

33

may have been done at the special instance and request of the other party to the contract, does not excuse the contractor for making his claim therefor in writing to the resident engineer within one month, as required by said stipulation, in order for him to be entitled to compensation for such work.

3. *Same; same; recovery under common counts for extra work.* In an action to recover an amount alleged to be due the plaintiff for the building of a railroad, where the complaint contains a count seeking to recover the amount sued for under a contract entered into between the plaintiff and the defendant, and also contains the common counts for work and labor done and material furnished, the plaintiff can not recover under the common counts for extra work, when it is shown that the road was constructed under an express contract entered into between the parties, which was introduced in evidence and which expressly stipulated that no claim for extra work would be allowed unless it was made "in writing to the resident engineer within a month after said work has been done," and it was not shown that the claim for extra work had been made according to such stipulation; the contract under which the road was built not having been fully executed, in so far as the claim for extra compensation was concerned, by reason of the failure to make the claim within the time and in the manner stipulated.

4. *Same; same.*—In an action to recover an amount alleged to be due under a contract for the construction of a railroad, where, in the contract sued on, the plaintiff was to be paid at different rates according to the classification of the work done, but there was no stipulation in said contract authorizing any one to determine what was the classification of the work done, nor that the estimates furnished by the engineer as required by the contract should be final between the parties, it is permissible for the plaintiff to introduce evidence tending to show that he had performed more work than the defendant had offered to pay for, and that some of the work done by him was of a classification calling for higher compensation than that fixed in the final estimate furnished by the defendant to the plaintiff.

APPEAL from the Circuit Court of Montgomery. Tried before the Hon. J. C. RICHARDSON.

This was an action brought by the appellants, C. G. Abercrombie and W. Z. Williams as partners under the firm name of Abercrombie & Williams against the appellee, W. F. Vandiver; seeking to recover $150,000 alleged to be due from the defendant to the plaintiffs.

The complaint contained three counts. The first two counts of the complaint counted upon a contract alleged to have been made by the parties to the suit, whereby the plaintiffs undertook to do certain work and furnish certain materials in the construction of a railroad for the Southwestern Railway Company; these two counts setting out in substance the contract sued on, and averring a performance on the part of the plaintiffs of their part of said contract, and the failure on the part of the defendant to pay for the work after it was completed and accepted. The third count was the common count for work and labor done and materials furnished by the plaintiffs for the defendant at the latter's instance and request. The cause was tried upon issue joined upon the pleas of the general issue and payment.

On the trial of the cause, the plaintiffs introduced in evidence the contract, which was the basis of the suit. This contract was entered into on June 10, 1897, by and between the defendant, W. F. Vandiver as party of the first part, and the plaintiffs, C. G. Abercrombie and W. Z. Williams, composing the firm of Abercrombie & Williams, as parties of the second part. The said contract contained the following stipulations: "The parties of the second part hereby promise, agree, undertake, and contract to construct in so far as herein specified in the most substantial and workmanlike manner and to the satisfaction and acceptance of the Chief Engineer of the Southwestern Alabama Railway Company, a railroad from or near the town of Newton, Ala., to such point in Coffee county, Alabama, at or near Elba, as the Chief Engineer of the said Southwestern Alabama Railway Company may designate, and along and upon the right-of-way of the said Southwestern Alabama Railway Company.

"The said parties of the second part agree to do the things herein by them contracted in a first class and workmanlike manner, and to the satisfaction of the chief engineer of the Southwestern Alabama Railway Company, and within the time and upon the terms and conditions herein and in the specifications hereto attached and set out.

"The said parties of the second part hereby agree and bind themselves to complete the grade, to have in all trestles, culverts and bridges designated by the chief engineer as hereinbefore stated, so that the track may be laid and a train of cars gotten within the corporate limits of the town of Elba on or before the 31st day of January, 1898.

"The said party of the second part hereby further agree to receive and accept from the said party of the first part from twenty-five thousand to twenty-seven thousand dollars of the subscription bonus made by the people along the line as an equivalent of twenty-five thousand dollars to twenty-seven thousand dollars in cash, the notes and other bonus to be transferred to the said parties of the second part without endorsement or guaranty as to the value of the party of the first part.

"It is hereby fully agreed and understood that if the said parties of the second part do not so complete the work herein undertaken by them to be done, that a train of cars might be gotten into Elba by or before the 31st day of January, 1898, the said party of the first part is in no way to be liable to the said parties of the second part for any loss that they may sustain, by reason of the non-collection of any of the bonus subscriptions hereinbefore referred to."

The next stipulation in the contract was that the parties of the second part were to protect the defendant if the former should collect any of the bonus subscriptions and failed to complete the road by or before January 31st, 1898.

The next stipulation of the contract was as follows: "It is further agreed and understood that the time limit of January 31st, 1898, is of the essence of this contract so far and only so far as the bonus hereby agreed to be delivered to the said parties of the second part may be concerned; the intention of this contract being that the said parties of the second part will do and perform all and everything herein agreed to be done by them, without reference to said 31st day of January, 1898, except in so far as said date and the arrival of a train at Elba may affect the value of said bonus."

There then follows the stipulation for the construction of road crossings, cattle guards and that the work

was to be performed in accordance with specifications attached to the contract. Following these stipulations were the following agreements:

"It is agreed between the parties hereto that monthly estimates shall be made between the first and the fifth day of each month, and shall be paid by or before the 20th of each month by the said party of the first part to the said parties of the second part that the cash payments made to bear such proportion to the entire work done in each month as the entire cash to be paid for all the work herein specified shall bear to the entire cash sum plus twenty-five to twenty-seven thousand dollars. That is to say, the estimates are to be so made that at the end and completion of this contract the said parties of the second part shall have received of the party of the first part a part of the bonus subscription herein referred to as the equivalent of the twenty-five to twenty-seven thousand dollars, to be distributed in the monthly estimates.

"The said parties of the second part will be permitted to receive advance payments on said bonus subscriptions subject to the conditions hereinbefore set out, but must, in all cases, promptly report such advance payments to the said party of the first part. It is agreed and understood between the parties hereto that the Plant Investment Company is to lay the track on said Southwestern Alabama Railway as fast as the road bed is completed in a manner satisfactory to the chief engineer of the Plant Investment Company."

Attached to this contract, and as a part thereof, were the specifications of the work to be performed by the parties of the second part. These specifications provided for clearing and grubbing in the construction of the road; for the making of excavations and the construction of embankments and drains. The other provisions of the specifications, so far as they pertain to the case at issue, were as follows:

"Classification of material: All excavated material will be classified either as earth, solid rock, or loose rock, or marl or hard-pan. Earth will include sand, loan, gravel, clay and muck. Loose rock will include all stone and detached rock found in separate masses, containing not less than one cubic foot, nor more than one cubic yard; also all limestone, slate or other rock,

soft or loose enough to be removed without blasting, although blasting may be resorted to. Hard-pan or marl will include all material not classified as earth, loose rock or solid rock, and all boulders containing less than one cubic foot. Solid rock will include all rock in masses of over one cubic yard, which can not be removed without blasting. All embankments shall be classified as earth, except where a material of higher classification has to be borrowed to form the bank."

"Acceptance of work. The contractor for grading must keep up all fences and enclosures adjacent to his work until it is complete and accepted by the resident engineer. He must also keep up in good condition all work done by him, without extra cost to the company, until same is accepted by the resident engineer, who must give the contractor written notice of such acceptance; but final estimate will not be made upon any section by the resident engineer until all other work under the same contract, lying between it and the end of the line from which the track is to be laid is accepted."

"In the case of disagreement between the resident engineer and contractor as to the meaning of these specifications the subject in dispute shall be referred to the Assistant Engineer in charge, who decision shall be final and binding. The chief engineer may, at his discretion, modify any part of these specifications, and such modification shall not render the contract void, but the increased cost of the work, if there be any, will be allowed the contractor provided he makes claim for the same in writing to the resident engineer as soon as he is notified of such modifications, and it shall be the duty of the resident engineer to give the contractor such notice without delay. In case such modification reduces the cost of the work, the same shall be estimated in favor of the company. The company reserves the right to at any time stop the work, abandon, change the line, and the contractor shall be entitled to receive pay for only such work as is actually done on each station on which work is begun and not completed, with an addition of ten per cent. on the same, which said payment shall release the company from any further obligations or claims for damages on account of the stoppage of the work."

"Extra or company work: Work on company account will be paid for at the rate of ten per cent. added to actual cost of labor, material and tools based on current prices at the time of the general work is being done. No claim for extra work will be considered except it be made in writing to the resident engineer within one month after said work has been done."

"Notice to contractors: Contractors will be prohibited from getting timber or ties from along the lines o᷍ the road now in operation, except with consent of the chief engineer in charge of the work. The resident engineer shall not forward a final estimate in favor of any contractor until the same has been examined by the contractor who must enforce his acknowledgment that he accepts the said estimate as a full return for all work done by him upon that portion of the line covered by his contract. On the completion of each successive five miles of work in accordance with this specification the same will be accepted by the company."

"Prices to be paid for work will be as follows:

"Excavation: Earth at eight and one-half cents per cubic yard, 0.08½ c. Solid rock, at thirty cents per cubic yard, 0.30 c. Loose rock, twenty cents per cubic yard, 0.20 c. Marl or hard-pan, sixteen and one-half cents per cubic yard, 0.16 c.

"Embankment: At eight and one-half cents per cubic yard, 0.08½ c. Overhaul, at one cent per cubic yard for each one hundred feet. Cattle guards, sixteen dollars per M. B. M. Road crossings, fourteen dollars per M. B. M. Box drains and culverts, sixteen dollars per M. B. M."

There was also introduced in evidence by the plaintiffs, an agreement for the modification of the contract sued on, so far as the price to be paid for different classifications of work was concerned. This modification was signed by each of the parties to the original contract and was as follows: "Montgomery, Ala., Sept. 16, 1897. The contract for the construction of the Southwestern Alabama Railway entered into between the undersigned on June 10th, 1897, is modified and changed as follows: The said W. F. Vandiver is to pay Abercrombie & Williams nine and one-half (9½) cents per cubic yard instead of eight and one-half (8½) cents per cubic yard for exca-

vations and embankments; and is to pay $15.00 per thousand and $17.00 per thousand board measure, instead of $14.00 and $16.00 per thousand board measure, for box drains and cattle guards and is to pay Abercrombie & Williams, by or before October 1st, 1897, four thousand ($4,000.00) dollars in cash, for all clearing and grubbing, for entire line of railroad. These changes to relate back to beginning of contract."

The plaintiffs then introduced evidence tending to show that they had, in all respects, fully performed said contract, except in so far as they were excused therefrom by the defendant; that the whole of the work which plaintiff performed under the contract was not completed until August 4th, 1898, when such work, by agreement of parties, was duly accepted by the defendant as and for the full performance of the contract on the part of the plaintiffs; that the line of said railway as originally laid out and surveyed ran into the town of Elba, and that the plaintiffs cleared the right of way along the original line of location into the corporate limits of said town, but that during the progress of the grading of said road, towit, in the month of February, 1898, the chief engineer of the Southwestern Alabama Railway Company changed the location of the line of said railway, beginning at a point about one mile east of the town of Elba and deflecting to the south from said point, and that said changed line did not run to any point within the corporate limits of the town of Elba, but passed said town about $\frac{1}{4}$ of a mile to the south, and that said railroad as afterwards finished and completed, never entered the corporate limits of said town of Elba; that the plaintiffs did the work required on the changed location and so far completed the same to July 1st, 1898; that the defendant, by agreement, accepted the work as the full completion of their contract, releasing the plaintiffs from said work on the road, and that while plaintiffs never fully completed the work required to be done under the contract, they were, nevertheless, released and excused therefrom by an agreement between them and the defendant, and that the work, which was performed by the defendant was treated and considered as the full performance of the contract on plaintiff's part.

[Abercrombie & Williams v. Vandiver.]

The plaintiffs further introduced evidence tending to show that as the work progressed, eleven monthly estimates of the work were made by the engineer in charge of said work, and that soon after the completion of the work as above stated, a final estimate of all of the work was made by the engineer of the Southwestern Alabama Railway Company, which was furnished to the plaintiffs by the defendant; that this final estimate included the work mentioned in the monthly estimates, and that in the classification made in the monthly and final estimates, the engineer of the railway company estimated the excavations and embankments made by the plaintiffs in the performance of said contract, and the prices which the plaintiffs were entitled to for such work, as follows: "437,111 cubic yards, earth excavations at 9½ cents per cubic yard, making $41,525.55; 573,182 cubic yards embankments at 9½ cents per cubic yard, making $54,452.29; 21,864 cubic yards clay or hard pan excavations at 16½ cents per cubic yard $3,607.56; 21 cubic yards of loose rock excavation at 20 cents per cubic yard, making $4.20."

The plaintiffs then offered evidence tending to show that in classifying the excavations made by the plaintiffs in doing the work the civil engineer in charge of the same had committed a mistake in this, that he had clssified about one hundred and forty thousand cubic yards of said excavation so made by the plaintiffs in doing said work as earth excavation, when he should have classified it as hard pan, thereby decreasing the amount coming to the plaintiffs therefor; but the defendant objected to the said evidence thus offered on the ground that said estimates were final and conclusive upon the plaintiffs and could not be by them impeached. The court sustained the said objection, and refused to allow the plaintiffs to introduce said testimony, and to the ruling of the court the plaintiffs duly and legally excepted. The plaintiffs then offered evidence tending to show that the plaintiffs had, in the progress of said work, excavated one hundred and sixty thousand cubic yards of hard-pan instead of 21,864 cubic yards, as allowed in said final estimate, but the defendant objected to the introduction of said evidence on the ground last above stated, and the court sustained the said objection and refused to allow the plaintiffs to introduce such

evidence, and to this ruling of the court the plainiffs duly and legally excepted.

The plaintiffs then offered to prove by one C. P. Hammond, who was shown to be a civil engineer of many years' experience in the grading and construction of railroads, what amount of hard-pan had been removed from certain designated cuts along the railroad in question, by the plaintiffs. The defendant objected to the making of such proof, upon the ground that the estimates by the engineer of the railway company were final and conclusive upon the plaintiffs and could not be impeached by them. The court refused to allow the plaintiffs to make such proof, and to this ruling of the court the plaintiffs duly and legally excepted. At the time of asking said question, plaintiffs counsel stated to the court that he expected to show by the said witness that in performing their said work on said railroad, and in making excavations thereon, the plaintiffs had removed one hundred and sixty thousand cubic yards of hard-pan, instead of 21,864, the amount allowed in said final estimate, and that the question was asked with a view to making said proof. The circuit court ruled, while plaintiff was examining his witnesses and on questions propounded to said witnesses by plaintiffs' counsel, that, under the contract and complaint in this case, the estimates made by the said civil engineer of said railroad company above mentioned, were final and conclusive upon the plaintiffs, and that they could not show that said engineer in making them had made an error or mistake in the classification of said excavations, allowing to the plaintiffs less of hard-pan than they had actually removed, and would not allow plaintiffs, though they offered to do so by competent witnesses, to introduce evidence to show such error or mistake; and to this ruling of the court, the plaintiffs then and there duly and legally excepted.

The plaintiffs also offered evidence to show that during the progress of the work in the performance of said contract, they, at the special instance and request of the defendant and as directed by him, did a considerable amount of extra or company work not specified in the specifications attached to said contract. Evidence of each of these several items were offered

by the plaintiffs separately; and further offered to show that neither of said items were allowed in said estimates, or any of them. When these offers were made, the defendant separately objected to the introduction of the evidence offered to show the same, upon the grounds that if such extra work was in fact done, no claim therefor, in writing was ever made to the resident engineer, and that if the same was not in fact included in the said estimates, said estimates were nevertheless final and conclusive upon the plaintiffs and could not now be impeached by them. The court separately sustained said objections and refused to allow the plaintiffs to introduce the evidence offered in respect thereto. To this ruling of the court the plaintiffs then and there duly and legally excepted.

The evidence for the plaintiffs further tended to show that the plaintiffs had never acquiesced in the monthly estimates which were made of the work performed, but that when they were furnished to them they protested to the defendant that they were not correct, but erroneous, in that they did not allow the plaintiffs a sufficient amount of work in hard-pan or clay; and that at the time the said final estimate was furnished to them, the plaintiffs declined to accept it, but protested that it was incorrect and erroneous, and they refused to accept the sum of money tendered them by the defendant in settlement of the amount shown by such final estimates, to be due them under the contract; stating to the defendant at the time, that there was a much larger sum due them than was there offered. It was further shown by the evidence that the railway company received from various parties residing near the town of Elba and other places along the line of said railway notes for various amounts aggregating the sum of $21,090; that these notes were part of the "specification bonus" mentioned in the contract, in the provisions thereof relating to their being received by the plaintiffs in part payment of the work to be done under said contract, and that on or about September 20, 1897, the defendant delivered to the plaintiffs said notes in part payment, as aforesaid, for which the plaintiffs executed a receipt; that the delivery of these notes was made before the completion of said railroad and before the location thereof was changed as mentioned above.

The plaintiffs then introduced evidence tending to show that they did not know that the defendant or the said railway company had determined to change said location so as not to run into the corporate limits of the town of Elba, until some time after said change had been determined upon and made, and were never informed, as a matter of fact, that said road would not be run into the corporate limits of the town of Elba until after the 31st day of January, 1898; that upon becoming informed that said road would not be built to a point within the corporate limits of Elba, the plaintiffs, in July, 1898, tendered back to the defendant all of said notes except about three thousand dollars thereof, which they agreed to take as credits and stated that they would not take the others as credit upon said contract; that the defendant refused to receive back said notes, but insisted that he was entitled to a credit for the amount thereof; that said tender of said notes was first made on July 14, 1898, and was in writing; that said notes were also tendered back to said defendant on or about July 19, 1898, and was in writing; that since the said tender the plaintiffs have held said notes subject to the order of defendant, and on the trial had them in court for delivery to defendant, and were then ready to deliver the same, and then again tendered the same back to the defendant, but he refused to receive them. A copy of one of the bonus subscription notes is attached to the bill of exceptions as an exhibit, and the others of said notes were of the same import, containing the same terms and provisions, except that they were for different amounts and the dates and names of the makers were also different. One condition contained in all of these notes was that the amount agreed to be paid was payable, if the Southwestern Alabama Railway Company was constructed to some point within the corporate limits of Elba, Alabama, by or before January 31st, 1898.

The defendant offered evidence tending to show that he had paid to the plaintiffs the several sums called for under the contract, in the monthly estimates which were furnished. The defendant also introduced evidence tending to show that on the 2d day of October, 1897, he delivered to the plaintiffs a number of deeds convey-

ing separate tracts of land along and near the line of said railroad, in part payment of the plaintiffs' demands under said contract; that these deeds were received by the plaintiffs in part payment of said demands; that these deeds were so delivered and received on an agreed valuation of $5,910; that the plaintiffs on said last named date executed a receipt to the defendant for said deeds as a payment on said demands to the amount of said valuation; and that the defendant was entitled to a credit of $5,910 on said demands by reason of receiving said deeds. This was substantially all of the evidence introduced on the trial of the cause.

At the request of the defendant the court gave to the jury the following written charges, to the giving of each of which the plaintiffs separately excepted: (1.) "If the jury believe the evidence, the defendant is entitled to a credit of $21,090 as payment on account of the bonus notes mentioned in the contract sued on." (2.) "If the jury believe all the evidence in this case, the plaintiffs are only entitled to recover $5,267.82."

There were verdict and judgment for the plaintiffs, fixing their recovery at $5,267.82. The plaintiffs appeal, and assign as error the several rulings of the trial court to which exceptions were reserved.

FRED S. BALL, JOHN P. TILLMAN and WILLIAM H. THOMAS, for appellants.—The final estimate in this case was not binding and conclusive upon the plaintiffs, thereby concluding them from showing the true classification of the work done by them. We do not question that, according to the great weight of authority, where parties contract that the decision, or estimate, or certificate of a given party, touching quantity or quality of a given work, shall be final and conclusive, the decision or estimate or certificate of such party is binding upon both parties in the absence of fraud or gross mistake; but our contention is that this is because the parties have so contracted.—*Railroad Co. v. McGrann*, 33 Pa. St. 530; *M. & C. R. R. Co. v. Wilcox*, 48 Pa. St. 16. There is no provision whatever in the contract under consideration, making any estimate, monthly or final, final and binding upon the parties. It follows, therefore, that they were not final and binding, but might

be impeached by either party for error or inaccuracies. *Brann v. Winans*, 37 Ill. 248; *Oberlies v. Un. Pipe Works*, 39 N. Y. Supp. 216; *Rusling v. School Dis.*, 25 Mich. 419; *Railway Co. v. Cummings*, 5 Ky. 441.

It can not be a sound construction of the provision found in the specifications, that it makes the final estimate binding and conclusive upon the parties. In the first place, there was no disagreement so far as shown by the records, "as to the meaning of these specifications; but even if there was, either party has the privilege of having such disagreement referred to the assistant engineer, a privilege he could exercise or not; but if he did not exercise it, then he waived it. In no sense is the final estimate a decision of the arbitrator agreed upon between the parties; but if it were, it is of a matter that was never *"referred"* to him by the parties, and of which he, therefore, never acquired jurisdiction. Again, the question now in dispute between the parties is not a difference between them *as to the meaning of any of the specifications;* but it relates to the quantity of a certain class of work which was done by the plaintiffs in the performance of the contract by them; the defendant, through the engineer, saying that that work was of a certain classification, while they say it was of a different classification. So far as this question was concerned, the engineer was acting for, and as the agent of the defendant, not as an arbitrator between the parties. That this is the construction of the provision under discussion, is manifest from the language used; and the authorities construing similar provisions in contracts uphold our construction.— *Walker v. Syms*, 76 N. Y. Rep. 320; *Mallard v. Moody*, 31 S. E. Rep. 45; *Denver R. R. Co. v. Riley*, 7 Col. 494. Clearly we have right here to show an error in classification.—*Kistler v. R. R. Co.*, 88 Ind. 460; *Shuman v. City of New York*, 1 N. Y. 316.

But even assuming that we are in error, and we cannot recover upon special count on the contract, because of this provision of the contract; yet, we were entitled to recover under the common count for such work as we did.—*Davis v. Badders*, 95 Ala. 348, 361; *Adams v. Cosby*, 48 Ind. 153; *Yeats v. Ballentine*, 56 Mo. 530; *Dinsmore v. Livingston*, 60 Mo. 241; *Williams v. Chi-*

*cago,* 112 Mo. 463; s. c. 20 W. Rep. 631; 34 Am. St. Rep. 403.

The court erred in sustaining defendant's objection to the evidence offered by the plaintiffs in respect to extra work.

The whole purpose of this clause of the contract was to protect the defendant against fraudulent or fictitious claims for extra work. They had the right to have such claims passed upon the resident engineer of the railroad company, for whom the work was being done; but this was a mere privilege for their protection against claims which may have been ordered by some agent of the defendant, or claims for work done without any orders from any one. It could not mean that it covered claims for extra work which was done at the special instance and request of the defendant himself, and by his discretion. The reason for inserting the clause would not apply to such work; and in such case he would be held to have waived the provision of the contract.—*Meyer v. Berlandi,* 53 Minn. 59; s. c. 54 N. W. Rep. 937; *Keating v. Nelson,* 33 Ill. App. 357; *Ramsburg v. McCahan,* 3 Gill. 341; *Wood v. Ft. Wayne,* 119 U. S. 312.

"A party who engages to do work has the right to proceed free from any let or hindrance of the other party, and if such other party interferes, hinders and prevents the doing of the work to such an extent as to render its performance difficult and largely diminish the profits, the first may treat the contract as broken, and is not bound to proceed under the added burdens and increased expense. It may stop and sue for the damage which it has sustained by reason of the nonperformance which the other has caused."—*United States v. Peck,* 102 U. S. 47. See Addison Contract § 326; *Fleming v. Gilbert,* 3 John. 527; *Kenedy v. Kenedy,* 5 Am. Dec. 629; *Marshall v. Craik,* 2 Am. Dec. 647; *Lynch v. Sellers,* 6 So. Rep. 561; *Belshow v. Colie,* 1 Ed. Smith, 203; *Connelly v. Devoe,* 37 Conn. 57; *Powers v. Hogan,* 6 N. Y. 239; *Frost v. Clarkson,* 7 Cow. 24; *Seipel v. Ins. Co.,* 84 Pa. St. 47; *Amer Life Ins. Co. v. McAden,* 109 Pa. St. 399; *Auril Min. Co. v. Humble,* 153 U. S. 540.

[Abercrombie & Williams v. Vandiver.]

When a party enters into an agreement which can only take effect by the continuance of a certain existing state of circumstances, there is an implied engagement on his part that he will not of his own motion, do anything to put an end to that state of circumstances, under which alone the agreement can be operative.—1 Chitty on Cont., 89 (ed. of 1874); 2 Parson on Cont., 676 a; 1 Addison on Cont., 476 § 326; *Id.* 560, § 396; *Brooms Leg. Maxims*, 214; *Kugleer v. Wiseman*, 20 Ohio, 361; *Dubois v. Del. & H. Canal Co.*, 4 Wend. 285; *Crossgrove v. Himmelrich*, 4 P. F. Smith 203; *Planche v. Colburn*, 8 Bing. 14; *West v. Blackway*, M. & G. 751; *Sterling v. Maitland*, 117 E. C. L. R. 840; *Inchbolt v. Western N. Co.*, 17 C. B. (N. S.) 733.

GRAHAM & STEINER and A. A. WILEY, *contra*.—The plaintiffs make no charge in their complaint of any fraud, partiality, dishonesty or such mistake as will amount to fraud, against the estimates made by the engineer. The complaint is not one for damages for the breach of a contract, but it is an action on the contract itself for money due thereunder, which plaintiffs allege that the defendant owes. The plaintiffs can not recover for anything except what the contract provides. They introduced the contract in evidence themselves, bound themselves by it, hence there is no question of damages that arise sometimes in causes of this sort as the suspension of the work by the plaintiffs was voluntary on their part. It was the clear purpose and intent of both parties to the contract, as shown by their acts, from the inception to the end, even outside of the binding contract, that Fitzsimmons, the engineer, was to make the estimates upon which payments should be made. The contract provides for estimates by an engineer. These estimates are competent testimony, as they were made in duplicate and always submitted to both parties, and this is shown, not only by the evidence in the case, but by the estimates themselves, as it will be seen from an inspection thereof, that, in addition to their having been paid, they were *approved* by Abercrombie & Williams. Hence they were not *ex parte*.—See *Tenn. R. R. Co. v. Danforth & Armstrong*, 112 Ala. 80.

[Abercrombie & Williams v. Vandiver.]

The plaintiffs can not be heard, regardless of the other proposition of law involved in this cause, to go behind the estimates that were made under the contract, and more especially those estimates which were, by the plaintiffs themselves, approved. Up to this point there can be no question but what they are binding, as to classification and amounts, upon the plaintiffs.—*United States v. Robeson,* 9 Peters 319; *Western Assur. Co. v. Hall,* 112 Ala. 318; *Martinsburg v. Potomac R. R. Co.,* 114 U. S. 549; *Chicago v. Price,* 138 U. S. 917.

Where the contract provides for the performance of work, as the evidence in this case shows, they have only a right to recover on the contract they introduced themselves. They do not show that any work was done by the plaintiffs for the defendant at his request, or that any other work was done except and save what was done by them voluntarily, under and in pursuance of the contract.—*Badders v. Davis,* 88 Ala. 367; *Davis v. Badders,* 95 Ala. 348; *Springs v. Maher,* 48 Ark. 522; *Downing v. McFadden,* 18 Pa. 334. The plaintiffs can not recover on the common count.

The plaintiffs cannot recover for extra work. The contract speaks for itself on this proposition, and there is no effort on the part of the plaintiffs to show that they have complied with that provision of the contract. Nowhere in the testimony is there any evidence of any sort sought to be shown that any claim for extra work was ever made in writing to the engineer, at any time.—*Badders v. Davis,* 88 Ala. 367; *Davis v. Badders,* 95 Ala. 348.

HARALSON, J.—The appellants, plaintiffs below, sued the appellee, defendant, for a breach of contract, by which they agreed with him to construct a railroad from or near the town of Newton, Alabama, to such point in Coffee county, in this State, at or near Elba, as the chief engineer of the Southwestern Alabama Railway Company might designate. One of the terms of the contract provided that the plaintiffs should receive, as part of the consideration for their work and labor, from $25,000 to $27,000 of the subscription bonus, as the equivalent of so much cash. It was fur-

34

ther stipulated that no liability should attach to the defendant, the other contracting party, by reason of the failure to collect any of the subscription bonus notes, in the event the road was not constructed, so that a train of cars might be run into Elba on or before January 31, 1898,—a condition on which said bonus notes were payable. The evidence is without conflict to show that the road was not so completed within that time. The plaintiffs insist, however, that because of the fact that the terminus of the road was changed so as not to be built within the corporate limits of the town of Elba at all, and because the subscription bonus was conditioned upon the building of the road into the corporate limits of said town,.they have the right to tender back the subscription bonus notes received by them, and demand their equivalent in money. This construction entirely overlooks the fact that *time* in the completion of the road into Elba. was expressly made of the essence of the contract. The change in the location of the road from a point within the corporate limits of the town of Elba to some point without, having been made, as was authorized by the contract, after plaintiffs had made default as to the time limit of the contract,—January 31, 1898,—to-wit, in February, 1898, it is manifest that whatever loss, if any, which resulted from the failure to collect the subscriptions must fall upon the plaintiffs. It may be, and doubtless is true, that no change could have been made as to the terminus in Elba, before it was ascertained that the road could not be completed within the time specified, so as to conclude plaintiffs by reason of the receipt of the subscription bonus. But the evidence shows that their failure to so complete the road was not due to any change contemplated to be made, or which was made, as to the terminus of the road within Elba, and such change was not made until after default to complete, within the time limit, into Elba; and there being a failure to complete the road to that point within the time limited, and time being of the essence of the contract by express stipulation, in so far as the subscription bonus was concerned, it follows that the contention of the plaintiffs is without merit.—*Thornton v. Sheffield, etc. R. R. Co.,* 84 Ala. 109; 3 Am. & Eng. Encyc. of Law, 915n.

2. It is insisted that the plaintiffs are entitled to recover for extra work beyond that specified in the con-

tract.   Upon this question the contract provides that "work on company account will be paid for at the rate of 10 per cent. added to actual cost of labor, material, and tools, etc.   *   *   *   No claim for extra work will be considered except it be made in writing to the resident engineer within one month after said work has been done."   It is said, this clause has no application in view of the fact that such work was done at the special instance and request of the defendant.   The clause itself makes no such exception.   It provides in language as general as possible, that "no claim will be considered except it be made in writing," etc.   To hold that it only applied to certain kinds of extra work or extra work done voluntarily by the plaintiffs or at the instance of some agent of defendant, would be an interpolation of language not used in the contract.   The contract must be treated as made by the parties, regardless of whether its terms seem harsh or imprudent, provided it offends no rule of public policy.   By the very terms of the clause we are considering, there was contemplated the performance of work other than that contained in the specifications; it fixed the method by which compensation for such work could be reached, and it also provided that such work would not be paid for unless a claim in writing was made within a specified time to a particular person.   The making of the claim in the manner stipulated was a condition precedent to the right of plaintiffs to claim compensation, and as there is nothing in such a condition offensive to public policy, it only remains for the courts to give it force and effect.   Under this clause the defendant had the right to know as the work progressed how much the extra work would cost him, and this right existed whether the work was at his instance or voluntarily done by plaintiffs, or otherwise.   The cases of *Wood v. Fort Payne,* 119 U. S. 312, and *Meyer v. Berlandi,* 53 Minn. 59, cited by appellants, were cases in which there was an alteration in the contract, so that the parties proceeded in disregard of the original contract, and as upon a new agreement. If the parties to this agreement had by mutual consent changed the terms of the contract, or if the plans and specifications had been mutually changed, thereby increasing the cost of the work, the clause would perhaps have no application.   It results that the claim for extra compensation cannot be sustained, unless the condition

precedent was fulfilled.—*Badders v. Davis,* 88 Ala. 367; *Davis v. Badders,* 95 Ala. 348.

It is a general rule that there can be no recovery upon an implied agreement, when the proof establishes an express one. There is, however, an exception to this rule in this, that when the express agreement has been fully executed by the complaining party, and no duty remains but the payment of money by the other, a recovery can be had upon the common counts as upon an implied contract. As long as the contract, in other words, is executory, it must be specially declared upon. *Jonas v. King,* 81 Ala. 285. The appellants cannot recover upon the common counts, because there is shown to be an express contract which they have not fully executed, in so far as a claim for extra compensation is concerned, by reason of the failure to make the claim within the time and in the manner stipulated. It is true, defendant accepted the work as and for a full performance, but such acceptance was under the contract and upon the presumption that the claim for extra work was abandoned rather than that the condition precedent to its validity was waived.—53 Minn. 59, *supra.*

3. It is further insisted that plaintiffs have only received a part of the compensation due them under the contract, and they now seek to recover the balance, which defendant says he does not owe, on account of certain estimates that were made from time to time by an engineer as to the amount and character of the work done, and which said estimates he claims are final and conclusive upon both parties. It may be conceded as settled law, that the parties to a contract may stipulate that the estimate of the work done and the compensation due under it, to be made by a third party, shall be final and conclusive, and such stipulation is binding in the absence of fraud or bad faith.—*Railroad Co. v. March,* 114 U. S. 549; *Chicago etc. R. R. Co. v. Price,* 138 U. S. 185; notes to *Church v. Shanklin,* 17 L. R. A. 211, 212; *Western Assurance Co.v. Hall,* 112 Ala. 318. It is equally true that the estimate of the amount due is not binding in the absence of a provision in the contract to that effect.—*Schuler v. Eckert,* 90 Mich. 165; *Memphis, etc. R. R. Co. v. Wilcox,* 48 Pa. St. 161; *Central Trust Co. v. Louisville, etc. Railway Co.,* 70 Fed. Rep. 282. The question for decision, there-

fore, is whether or not there exists any such provision in the contract under consideration. Counsel for defendant refer us to two clauses which, taken in connection with the provision requiring the work to be done to the satisfaction of the chief engineer of the Southwestern Alabama Railway Company, and the conduct of the parties in relation to the contract, they insist must be so construed as to deprive plaintiffs of the right to question the engineer's estimates. The first provides that monthly estimates shall be made between the 1st and 5th of each month, and shall be paid by the 20th. Without stopping to give a definition of the word estimates, or attempting to state exactly what this clause does mean, it is clear that it does not give to the estimates therein mentioned any conclusive effect whatever, nor is any particular person designated by it to make the estimates. We do not undertake to say what effect the making of the estimates and their approval by plaintiffs would, without more, of themselves have. That question is not before us. The next clause relates to disagreements between the resident engineer and the contractors as to the *meaning of the specifications,* in which event the clause provides, that the *subject in dispute* shall be referred to the assistant engineer whose decision shall be final. It would appear to be the intention of the parties as expressed in this clause, to provide a method by which controversies as to the manner of the execution of the work, could be quickly adjusted by reference to an arbiter or umpire.—*Welch v. Woodworking Co.,* 38 Atl. Rep. (N. J.) 824; *Denver etc. Railway Co., v. Riley,* 7 Colo. 494. But it certainly cannot be held to mean, that the engineer can finally decide what compensation should be paid for the work, since that is fixed by the contract, and it is not conceivable how any controversy as to it could arise between the engineers and the contractors. This is a matter with which the engineers had nothing to do, provided the work was done in accordance with the contract to the satisfaction of the chief engineer. Neither in the clause under consideration nor elsewhere in the contract, is any engineer authorized to determine what was the classification of the material excavated in the progress of the work, for this bears no relation whatever to the excellence of the work or the manner of its execution.

The only possible way in which a dispute could arise over these matters would be through estimates as to the classification of the excavated material. But nowhere in the contract is any engineer authorized to make any estimates at all, unless it can be inferred from that clause in the specifications under the head of "Notice to Contractors," which reads as follows: "The resident engineer shall not forward a final estimate in favor of any contractor until the same has been examined by the contractor who must endorse his acknowledgment that he accepts said estimate as a full return for all the work done," etc. If we concede that this authorized the resident engineer to make the estimates, it is apparent that instead of being made conclusive none of them had any binding effect, except the final one, and that only when examined by the contractors and they acknowledged in writing upon it that it is accepted in full return for all the work done. The uncontradicted evidence shows that this was not done. It will be observed that there are three different kinds of engineers mentioned in the contract,—the chief engineer, the assistant engineer in charge, and the resident engineer. To none of them does the contract expressly give the authority to make the estimates mentioned therein. But if we should indulge the presumption or construction that such authority rested with the resident engineer, there is still absent a provision making such estimates final between the parties. The conduct of the parties in relation to the contract, whatever it may have been, can have no weight in its interpretation, since that can only serve as an aid, in, the event the contract contains provisions of an ambiguous nature. *Comer v. Bankhead,* 70 Ala. 136. It, therefore, follows that the circuit court erred in refusing to allow proof of the amount of work done under the contract and the classification of the material excavated. For this error the judgment is reversed and the cause remainded.

Reversed and remanded.