853 So.2d 194 (2002)
Caroline Edwards POTTS
v.
BAPTIST HEALTH SYSTEM, INC., and Walker Regional Medical Center, Inc.
1011234.
Supreme Court of Alabama.
December 20, 2002.
*195 Garve Ivey, Jr., of Ivey & Ragsdale, Jasper; and Mark B. Turner, Jasper, for appellant.
William G. Somerville III and Lynlee Wells Palmer of Johnston, Barton, Proctor & Powell, L.L.P., Birmingham, for appellees.
HARWOOD, Justice.
On February 9, 1999, Caroline Edwards Potts, a registered nurse and a former employee[1] of Walker Regional Medical Center, Inc., sued Baptist Health System, Inc. (hereinafter referred to as "BHS"), Walker Regional Medical Center, Inc., and other individual defendants,[2] alleging breach of contract, defamation, intentional infliction of emotional distress, invasion of privacy, and wrongful termination. Potts's claims arose from the termination of her employment with Walker Regional Medical Center, Inc., d/b/a Walker Baptist Medical Center (hereinafter referred to as "Walker Medical"). In response to Potts's complaint, BHS[3] and Walker Medical (hereinafter jointly referred to as "the defendants") filed a motion to stay the proceedings and to compel arbitration pursuant to the arbitration provision contained *196 in a document entitled "Dispute Resolution Program" provided by BHS to Potts.
On November 21, 2000, Potts filed a "motion to strike and motion to continue Defendants' motions to compel arbitration pending discovery." The trial court issued an order on November 27, 2000, granting Potts's motion and allowing Potts 120 days to complete discovery relating to the enforceability of the arbitration provision. The defendants challenged the trial court's order allowing discovery by appealing the decision and also by filing a petition for a writ of mandamus. Although this Court denied the petition for a writ of mandamus on February 12, 2001, this Court later reinstated it and dismissed the appeal. Ex parte Walker Reg'l Med. Ctr., Inc., 825 So.2d 741 (Ala.2001). In that opinion, we issued a writ of mandamus directing the trial court to vacate its order granting discovery in Potts's action and ordered it, instead, to provide Potts with an opportunity to satisfy the factually-based-predicate standard as set out in Ex parte Greenstreet, 806 So.2d 1203 (Ala.2001).
The defendants thereafter submitted to the trial court a supplemental brief and several affidavits in support of their motion to compel arbitration. In response, on February 4, 2002, Potts's attorney sent a letter, accompanied by an affidavit by Potts, to the trial court. After a hearing on the matter, the trial court granted the motion to compel arbitration and dismissed the case on March 5, 2002.[4]
The trial court's order states, in pertinent part:
"The facts in this case show that defendants, Baptist Health System, Inc., and Walker Regional Medical Center, Inc., the parties moving for arbitration, met their burden of proving a prima facie showing, to-wit: (1) the existence of a contract between [Potts] and the defendants, and (2) that said contract contains an Arbitration Clause, and (3) that said transaction substantially affects interstate commerce, and thereupon, the burden of persuasion shifted to [Potts,] who is opposing arbitration, and the facts further show [Potts] failed to present a `factually based predicate' sufficient to give her a right to conduct discovery regarding matters that could invalidate the agreement to arbitrate and therefore, [Potts] has not overcome the prima facie evidence presented by defendants herein, and the Court is of the opinion that defendants' Motion to Compel should be granted."
Potts appealed to this Court, arguing: 1) that the trial court erred in compelling arbitration because, she argues, the transaction at issue had no effect on interstate commerce, and 2) that the circumstances surrounding the agreement to arbitrate render the agreement unconscionable. Potts makes no other arguments as to the arbitratibility of the dispute.
"`[T]he standard of review of a trial court's ruling on a motion to compel arbitration at the instance of either party *197 is a de novo determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review.' Ex parte Roberson, 749 So.2d 441, 446 (Ala.1999). Furthermore:
"`A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction [substantially] affecting interstate commerce. Id. "After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question."'

"Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000) (quoting Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (emphasis omitted))."
Vann v. First Community Credit Corp., 834 So.2d 751, 752-53 (Ala.2002).
Potts's complaint states, in relevant part:
"[D]uring or about 1994, [Potts] and Defendants entered into a written contract, via the Employee Handbook of policies and procedures, by which Defendants promised to employ [Potts] in consideration of [Potts's] nursing services.
"....
"That on or about September 22, 1998, [Potts], personally and through legal counsel, provided Defendants with a written request for a hearing by a specially selected Peer Review Committee as provided, under contract, in the Employment Dispute Resolution Program, as well as a request to review her personnel file. Defendants denied both requests.
"....
"That for a period of time between October 1996, to October 1998, the Defendants engaged in an orchestrated pattern and practice of harassment against [Potts] for reporting unsafe practices concerning patient well-being, engaged in by other medical nursing staff. Said harassment includes, but is not limited to, (1) refusing to give [Potts] employment benefits, although qualifying, (2) refusal to place [Potts] on full-time status, although working over 40 hours per week, (3) denying [Potts] proper training opportunities, although required to fulfill hospital certifications, and (4) denying [Potts] time off for medically necessary surgery."
Toni W. Geddings, the human resources director at Walker Medical, stated in an affidavit, in pertinent part:
"In the fall of 1997, Walker [Medical] began implementing a `Dispute Resolution Program' (`the Program'). Supervisory employees were required to attend a teleconference on October 20 and October 21, 1997. During this teleconference, it was explained that Walker [Medical] was adopting the Program, and that individuals who remained employed beyond January 1, 1998, would be bound by the Program. Carolyn [sic] Edwards Potts attended the teleconference on October 20, 1997. She was told during the meeting that the final step in the Program would be final and binding arbitration, that arbitration would be a substitute for going to court, and that claims she had or might have against Walker [Medical] would have to be submitted to binding arbitration. Attached as Exhibits [sic] B to this Affidavit is an acknowledgment form signed by Caroline Edwards Potts showing that she *198 received copies of the Program and that she understood that the Program would govern any future dispute she might have with Walker [Medical]. Attached as Exhibit C is a copy of a notice that was distributed with each employees' paycheck. The language contained in those notices was on posters that were posted in the hospital facility, including the main employee entrance. [Exhibit B is set out in part at a later point in this opinion; Exhibit C is omitted.]"
After signing the acknowledgment form, Potts continued working at Walker Medical until her termination in 1998. Regarding her termination from Walker Medical, Potts stated in her complaint:
"[O]n or about September 16, 1998, [Potts] was suspended without pay, by Defendants, until further notice due to an investigation into a patient's death without probable cause against [Potts]. Further, that when [Potts] asked Defendants for legal representation, [Potts] was refused such representation and [was] told [Potts] would be terminated if [Potts] pursued obtaining such representation.
"[O]n or about October 1, 1998, [Potts] received a certified letter from Defendants terminating [Potts's] employment with said Defendants without stating cause or charges against [Potts]."
The dispute or controversy presented, as ultimately defined and described by Potts's counsel in his February 4, 2002, letter to the trial judge and in Potts's attached affidavit, is as follows:
Letter: "The only transaction upon which we sue is the wrongful discharge of my client which was between two Alabama residents, in Alabama, concerning Alabama, and having nothing whatsoever to do with interstate commerce or any of the arguments set forth by the Defendants."
Potts's affidavit: "There is nothing in or about my complaint that has anything to do with interstate commerce, and the transaction I complain of is for the discharge by Walker Baptist Medical Center from my employment there."

(Emphasis added.) Potts states in her brief to this Court that she "has sued for wrongful termination."
The defendants initially argue that the health-care industry involves per se interstate commerce. In doing so, the defendants refer to the National Labor Relations Act, 29 U.S.C. § 151 et seq., and the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., to show that they are involved in interstate commerce. However, as this Court stated in Alafabco, Inc. v. Citizens Bank, [Ms. 1010703, Aug. 30, 2002] ___ So.2d ___, ___ (Ala.2002), "[h]olding that a transaction [or contract] is subject to the [Federal Arbitration Act] simply by virtue of ... Congressional regulation of some aspect of one party's business, would effectively transform every `local' transaction into a `national' one. As Sisters of the Visitation [v. Cochran Plastering Co., 775 So.2d 759 (2000),] points out, such an approach is impermissible under our federal system of government" (citing Sisters of the Visitation, 775 So.2d at 767, in turn citing NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937))(emphasis added).

I. Substantial Effect on Interstate Commerce
"Section 2 of the Federal Arbitration Act (`FAA'), 9 U.S.C. § 2, provides in pertinent part:
"`A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of *199 such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'
"Section 2 preempts conflicting Alabama law, including in particular Ala.Code 1975, § 8-1-41(3), which states that `[a]n agreement to submit a controversy to arbitration' cannot be specifically enforced.
"However, the FAA applies to render enforceable a predispute arbitration agreement only if the contract containing the agreement, or the transaction the contract evidences, `substantially affects interstate commerce.' Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759, 766 (Ala.2000); accord Equifirst Corp. v. Ware, 808 So.2d 1, 4 (Ala.2001). The party moving to compel arbitration has the burden of proving that the contract in question evidences a transaction substantially affecting interstate commerce. Chesser v. AmSouth Bank, N.A., 846 So.2d 1082 (Ala.2002)." AmSouth Bank v. Dees, 847 So.2d 923, 929 (Ala.2002). Accordingly, the focus of our inquiry is whether the defendants have shown that Potts's contract of employment, as effectively modified on January 1, 1998, by the implementation of the dispute-resolution program, or the transaction it evidences, substantially affects interstate commerce under the facts and circumstances of this case. The burden of proof was on the defendants to provide evidence demonstrating that Potts's employment contract, or the transaction it evidenced, substantially affected interstate commerce.
In an attempt to meet this burden, the defendants presented several affidavits.[5] Taken collectively, those affidavits show the following concerning the operations of BHS and Walker Medical:[6]
"The operation of Walker [Medical] involves several activities that have an impact on interstate commerce. The hospital is located in Jasper, Alabama, on U.S. Highway 78, which is a federal highway that is the primary transportation route between Birmingham, Alabama, and Memphis, Tennessee. The hospital treats out-of-state patients. In addition, the hospital receives millions of dollars in federal funds as reimbursement for treating Medicare beneficiaries.
"The hospital recruits physicians from other states, and in doing so uses telephones, the U.S. Mail, airlines, and other methods of interstate commerce. It also receives hundreds of thousands of dollars annually from out-of-state insurance carriers, health maintenance organizations, and employee welfare benefit plans, as reimbursement for patient care. Some of these out-of-state insurers (and their location) include: United Healthcare (Salt Lake City, Utah [,] and Greensboro, North Carolina); Mailhandlers (Jacksonville, Florida); Federal Black Lung Program (Lanham-Seabrook, Maryland); CHAMPUS (Florence, South Carolina); United Food & *200 Commercial Workers (Atlanta, Georgia); Central States (Rosemont, Illinois); Rural Carrier Benefit Plan (Charlotte, North Carolina); and, UMWS Health and Retirement Funds (Van Nuys, California).
"Many of [BHS's] contracts for supplies are procured through Novation, a supply cost management company. Novation is a national company managing more than $12 billion in annual purchases on behalf of more than five thousand (5000) health care organizations.... Novation provides contracts for VHA, a nationwide network of more than twenty-two hundred (2200) community-owned health care systems.... [BHS] is a VHA member and, therefore, uses Novation for many of its supply contracts. Novation's corporate offices are located in Irving, Texas.
"Walker [Medical's] nurses and doctors regularly use medical supplies provided by out of state vendors. Some of these vendors include: Kimberly-Clark (Roswell, Georgia); E.M. Adams (Fort Pierce, Florida); Abbott (Columbus, Ohio); Arrow International (Reading, Pennsylvania); Kendall (Mansfield, Massachusetts); and Sage (Crystal Lake, Iowa).
"... [W]ell over eighty percent, and probably ninety to ninety-five percent, of the materials used by BHS in its business come ultimately from outside the state of Alabama.
"... [A]t least 50% percent of these materials were shipped to BHS directly from out-of-state suppliers.
"BHS's revenues from its health care business and sales of health care services during the last five years have ranged from $750 million to $1,819 million (1.819 billion). All BHS hospitals have at least one employee whose job is to receive and handle goods from BHS vendors and suppliers.
"BHS's total gross revenues for the fiscal year ending June 30, 2001 were $1,819,431,476. The gross revenues for Walker [Medical] for the same period were $158,688,000. BHS purchased in excess of $100 million worth of materials in the fiscal year ending June 30, 2001. I would expect the figure for the current fiscal year to be approximately the same.
"It has been the habit and routine practice of BHS to purchase eighty to ninety-five percent of its clinical and nonclinical supplies from suppliers out of state or from suppliers in state who have contracted with BHS to obtain such goods from out of state."
Regarding the materials used by Potts in the course of her employment with the defendants, the affidavits show the following:
"Abbott Laboratories, a worldwide corporation headquartered in Abbott Park, Illinois, manufactures the intravenous fluid, intravenous tubing and PCA lifecare pumps used at Walker [Medical]. As a part of her job responsibilities, Caroline Edwards Potts began IVs, using intravenous fluid and intravenous tubing, and Abbott lifecare pumps.
"Allegiance, a national corporation headquartered in McGaw Park, Illinois, manufactures the glucose testing strips and latex gloves used by Walker [Medical]. As a part of her job responsibilities, Caroline Edwards Potts used glucose testing strips in caring for patients. As a part of her job responsibilities, Caroline Edwards Potts used latex gloves.
"Becton, Dickinson & Company, a national company based in Franklin Lakes, New Jersey, manufactures glucose testing strips and syringes used at Walker *201 [Medical]. As a part of her job responsibilities, Caroline Edwards Potts used syringes....
"Calgon Vestal, a company formerly based out of St. Louis, Missouri, manufactured wound care management products used at Walker [Medical]. Calgon Vestal is currently owned by Convatec, a division of Bristol Myers Squibb, and is headquartered in Skillman, New Jersey. As a part of her job responsibilities, Caroline Edwards Potts provided wound care management.
"Carstens, a national corporation located in Chicago, Illinois, manufactures the medical charting systems used at Walker [Medical]. Briggs Corporation, a national supplier headquartered in West Des Moines, Iowa, manufactures the chart labels used at Walker [Medical]. As a part of her job responsibilities, Caroline Edwards Potts used medical charts. Such charts were labeled.
"HammerMill, a division of International Paper, headquartered in Stamford, Connecticut, manufactures paper products used at Walker [Medical]. Xerox, an international corporation headquartered in Stamford, Connecticut, manufactures paper products used at Walker [Medical]. As a part of her job responsibilities, Caroline Edwards Potts received and made reports on patients and made assignments to other nurses on paper manufactured by HammerMill or Xerox.
"Kimberly-Clark, an international corporation with its world headquarters in Dallas, Texas, manufactures surgical masks used at Walker [Medical]. As a part of her job responsibilities, Caroline Edwards Potts used surgical masks.
"Nellcor, a national corporation headquartered in Pleasanton, California, manufactures pulse oximeters used at Walker [Medical]. Nellcor is a division of Tyco International, Ltd. Tyco International is a worldwide corporation with offices in Bermuda and Exeter, New Hampshire. As a part of her job responsibilities, Caroline Edwards Potts placed pulse oximeter probes on patients.
"Owens & Minor, a national distribution company headquartered in Richmond, Virginia, supplies Walker [Medical] with diapers, catheters and other medical/surgical supplies. As a part of her job responsibilities, Caroline Edwards Potts used ... needles, catheters and other medical/surgical supplies.
"Premium Plastics, a nationwide company with its home office in Chicago, Illinois, manufactures cups used to dispense medication to patients at Walker [Medical]. As a part of her job responsibilities, Caroline Edwards Potts distributed medication to patients. This medication was distributed in plastic cups.
"Pyxis Corporation, a national company headquartered in San Diego, California, manufactures the Pyxis system used at Walker [Medical]. As a part of her job responsibilities, Caroline Edwards Potts used the Pyxis system.
"Ross Products, a division of Abbott Laboratories, manufactures nutritional supplements given to patients at Walker [Medical]. Ross Products is an international corporation with corporate offices in Columbus, Ohio. As a part of her job responsibilities, Caroline Edwards Potts distributed nutritional supplements to patients.
"Tech:time, a corporation located in Sarasota, Florida, manufactured the time clock used at Walker [Medical]. When Caroline Edward Potts arrived at work, she clocked in on a time clock manufactured by Time:tech [sic].

*202 "... [W]ell over one-half, and probably close to ninety percent, of the goods and equipment used by [Potts] in the care of patients came ultimately from outside the state of Alabama.... [A]t least fifty percent of the goods and equipment used by [Potts] in treating patients at Walker [Medical] were shipped directly to BHS from out of state."
In Alafabco, Inc. v. Citizens Bank, supra, we observed:
"`The test adopted in Sisters of the Visitation [v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000),] focuses on the quantity and quality of involvement of foreign entities with the subject transaction. Specifically, the subjects of inquiry are (1) the "citizenship of the parties," (2) the origin of any "tools and equipment" actually used in the transaction, (3) the "allocation of cost of services and materials," (4) the "subsequent movement across state lines" of the "object of the services," and (5) the "degree of separability from other contracts." 775 So.2d at 765-67. An analysis applying these factors is "necessarily fact intensive." Id. at 765 n. 5.'" ___ So.2d at ___ (quoting Brookfield Constr. Co. v. Van Wezel, 841 So.2d 220, 221 (Ala.2002)).
BHS argues that the nature of its business operations and that of Walker Medical, the out-of-state origin and amount of the supplies provided for use by Potts and other nurses, and payments from out-of-state entities cause its employment contracts to affect interstate commerce. Regarding this point, we stated in Alafabco:
"The FAA [Federal Arbitration Act] renders enforceable any `written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal....' 9 U.S.C. § 2 (emphasis added [in Alafabco]). Thus, on its face, the FAA applies only to `transactions,' `contracts,' and `controversies.'
"The FAA defines `transactions' in the maritime context, as including `charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters ... which, if the subject of controversy, would be embraced within admiralty jurisdiction.' 9 U.S.C. § 1 (emphasis added [in Alafabco]). The FAA focuses on the narrow concepts of acts, omissions, or agreements, not on the broader concepts on which the Bank focuses, such as the nature of the parties' businesses or the general `course of dealings between the parties.'"

___ So.2d at ___ (last emphasis added).
Under §§ 1 and 2, the Federal Arbitration Act ("the FAA") is triggered only where the controversy arises out of a contract or transaction involving interstate commerce. Under our jurisprudence, that involvement must be substantial. See Sisters of the Visitation, supra. Here, the controversy relates to the alleged wrongful discharge of Potts. That discharge necessarily arose out of Potts's contract of employment and/or the "transaction" it evidencedher ongoing employment. Thus, the defendants must show that Potts's contract of employment, as effectively modified on January 1, 1998, by the implementation of the dispute-resolution program, or the transaction it evidencedher continued employmentsubstantially affected interstate commerce.
*203 Consequently, we now consider the evidence presented by the defendants in support of their motion to compel arbitration under the framework set out in Sisters of the Visitation.

A. Citizenship of the Parties

As the defendants acknowledge in their brief, "BHS, Walker [Medical] and Potts are all citizens of Alabama." Therefore, this category provides no support for a conclusion that Potts's modified employment contract or her continued employment with the defendants substantially affected interstate commerce.

B. Tools and Equipment Used in the Transaction

Potts's argument in her brief to this Court that this factor is not applicable here consists only of the assertation that "[t]his prong is inapplicable, in that there are no `tools and equipment.' The only `equipment' at issue is the labor of [Potts]." However, in the course of rendering her services, Potts necessarily used medical supplies provided to her by Walker Medical. The acquisition of those supplies by Walker Medical involved transactions between it and various suppliers. As the affidavits submitted by the defendants established, "at least fifty percent of the goods and equipment used by [Potts] in treating patients at Walker [Medical] [was] shipped directly to BHS from out of state," and "probably close to ninety percent of the goods and equipment used by [Potts] in the care of patients came ultimately from outside the State of Alabama." Potts's employment could not have continued without the constant flow into Walker Medical of the interstate stream of supplies indispensable to the performance of Potts's duties as a registered nurse. Thus, the interstate acquisitions of Walker Medical are related to the subject of the controversy between the defendants and Potts. Consequently, this category provides some support for a conclusion that Potts's modified employment contract or the transaction it evidenced in the form of her continued employment with the defendants substantially affected interstate commerce.

C. Allocation of Costs

Potts's only argument in her appellate brief concerning this factor is the simple assertion that "[a]ll of the plaintiff's services were performed in Alabama, for an Alabama entity, on Alabama patients, for an Alabama paycheck." The record shows that "BHS purchased in excess of $100 million worth of materials in the fiscal year ending June 30, 2001[and] the figure for the [then] current fiscal year [was expected] to be approximately the same." The record further reflects that "[i]t has been the habit and routine practice of BHS to purchase eighty to ninety-five percent of its clinical and nonclinical supplies from suppliers out of state or from suppliers in state who have contracted with BHS to obtain such goods from out of state." As also already noted, "well over one-half, and probably close to ninety percent, of the goods and equipment used by [Potts] in the care of patients came ultimately from outside the state of Alabama [and] at least fifty percent of the goods and equipment used by [Potts] in treating patients at Walker [Medical] were shipped directly to BHS from out of state." Thus, this category provides additional support for a conclusion that Potts's modified employment contract or her continued employment with the defendants substantially affected interstate commerce.

D. Subsequent Movement Across State Lines

The defendants argue that "[m]any of BHS's patients come from locales outside the State of Alabama and, consequently, cross state lines to pursue or to return *204 from medical treatment." This proposition is based solely on the statement in the affidavit of Bobby J. Davenport, vice president of support services at Walker Medical, that "[t]he hospital treats out-of-state patients." The record is silent as to whether or when Potts had any contact with those out-of-state patients, or the number or percentage of out-of-state patients treated at Walker Medical during any given period. Therefore, an analysis of this category provides no support for a conclusion that Potts's modified employment contract or her continued employment with the defendants substantially affected interstate commerce.

E. Degree of Separability from Other Contracts

The defendants argue in their brief to this Court that "BHS's at-will employment contracts, such as the at-will contract with Potts, cannot be separated from its interstate contracts to treat patients or purchase supplies." Under the facts and circumstances present in this case, we agree with the defendants' argument as it relates to the purchase of supplies. As already noted, Potts's performance of her employment duties was necessarily dependant upon the various contracts BHS had with its network of suppliers, many of whom were themselves located out of state, for a steady stream of medical supplies through the channels of interstate commerce.
Although the defendants have not provided sufficient evidence regarding all of the categories of the Sisters of the Visitation framework, they have shown that sizable amounts of goods used by Potts in treating patients were purchased in interstate commerce and also that Potts used many of those goods on a daily and recurring basis throughout the course of her employment with the defendants. Although this showing might not always be conclusive, under the facts and circumstances of this case, and in the absence of further argument and support from Potts, we conclude that the defendants have shown that their employment relationship with Potts did have a substantial effect upon interstate commerce. Thus, the FAA applies to the dispute among the parties and preempts Ala.Code 1975, § 8-1-41(3), which states, in relevant part, "The following obligations cannot be specifically enforced: ... (3) An agreement to submit a controversy to arbitration."

II. Unconscionability
Relying on American General Finance, Inc. v. Branch, 793 So.2d 738 (Ala. 2000), Potts next argues that the circumstances surrounding the agreement to arbitrate render that agreement unconscionable. Moreover, Potts specifically argues in her brief to this Court that "[t]o require the signing of an arbitration agreement under the circumstances of this case is unconscionable." However, the record does not show that Potts was forced to sign an arbitration agreement. To the contrary, the record shows only that Potts signed an "Acknowledgment of Receipt of BHS Dispute Resolution Program." Nonetheless, we understand her argument to assert that the imposition of the dispute-resolution program, containing the arbitration provision, contingent on her acceptance of continued employment with the defendants, was unconscionable. The only facts regarding the circumstances of this occurrence are contained in Potts's affidavit and in the previously quoted affidavit of Toni W. Geddings. Potts states in her affidavit:
"I was called into a room with twelve to fifteen people where I was played a pre-recorded tape and where a form was provided to me and the others, and we were told by employees of Walker Baptist Medical Center we had to sign the form or lose our job. I asked if I could *205 take the form and read it and return it later, and I was told I could not leave the room with the form and that I either had to sign it then and there or lose my job."
As Geddings stated in her affidavit, on October 20, 1997, Potts attended a conference where Walker Medical representatives explained that Walker Medical was adopting a new dispute-resolution program and that "individuals who remained employed beyond January 1, 1998, would be bound by the Program." Furthermore, Geddings stated, "Attached as Exhibits [sic] B to this Affidavit is an acknowledgement form signed by Caroline Edwards Potts showing that she received copies of the Program and that she understood that the Program would govern any future dispute she might have with Walker [Medical]."
Exhibit B, contained in the record, reads, in pertinent part:
"ACKNOWLEDGEMENT OF RECEIPT OF BHS DISPUTE RESOLUTION PROGRAM.
"I acknowledge receipt of the BHS Dispute Resolution Program document. I understand I am obligated to read this document as it governs my continued employment and all future legal disputes between me and [BHS] as defined in the document. I understand that it is my responsibility to consult with my Human Resource director if I have any questions."
Near the bottom of the form is a line reading: "Dispute Resolution Program Effective Date: January 1, 1998."
In American General Finance v. Branch, supra, this Court stated:
"`"Although Alabama law lacks an explicit standard for determining whether a contract or contractual provision is unconscionable, case law reveals that four factors are important in making this determination.
"`"In addition to finding that one party was unsophisticated and/or uneducated, a court should ask (1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided, or patently unfair terms in the contract."
"`Layne v. Garner, 612 So.2d 404, 408 (Ala.1992).'"
793 So.2d at 743. Potts is a registered nurse. We therefore infer that she is sufficiently well-educated to read and understand the documents concerning the BHS dispute-resolution program. Moreover, nowhere in the record does Potts argue that she is unsophisticated or uneducated.

A. Absence of Meaningful Choice
Under this factor, Potts argues that the facts surrounding her signing of the acknowledgment form deprived her of a meaningful choice regarding whether to sign the form. In so doing, Potts asserts that "both Potts and her husband were totally dependent upon [Walker Medical] for their living." Potts then concludes that the choice she was presented witheither refusing to sign the acknowledgment form and losing her employment, or signing the acknowledgment form and remaining employed"is not a meaningful choice." However, Potts makes no attempt to show that she would have been unable to obtain employment elsewhere during the period between her signing of the form relating to the BHS dispute-resolution program and the effective date of the program some 72 days later, or that her attempt to do so would require a considerable *206 expenditure of time and resources. See Conseco Fin. Corp. v. Boone, 838 So.2d 370, 373 (Ala.2002)("`[Boone has] made no showing that [she] lacked a meaningful choice in obtaining financing.... Nothing in the record suggests that [Boone] attempted to "shop around" for a financing arrangement that would not call for arbitration of disputes.'" (quoting Green Tree Fin. Corp. v. Lewis, 813 So.2d 820, 825 (Ala.2001))). The record reflects no showing by Potts concerning the job market for registered nurses in the area or evidence indicating that all other nursing jobs available to her would also have required her to agree to such an arbitration agreement.

B. Unreasonably Favorable Contractual Terms
As to this criterion, Potts alleges in her brief simply that "[t]he terms of the contract in the case confer all of the benefits upon [Walker Medical], preserving none to the Potts." She undertakes no analysis beyond this bare allegation. Important to this Court's holding in American General Finance v. Branch, supra, was the inclusion of two specific clauses in the arbitration agreement in that case. One of the offending clauses in that agreement exempted the lender, but not the borrower, from arbitrating certain types of claims, and the other limited the arbitrator's ability to award damages. By way of contrast, BHS's dispute-resolution program was equally binding on the parties, and it did not limit the arbitrator's ability to provide remedies under Alabama law. Moreover, the program afforded Potts specified rights, not otherwise available to her as an at-will employee, including the right to be heard by the supervisory structure and/or by a specially selected peer review committee in order to resolve a dispute before proceeding to arbitration. Thus, the type and degree of inequality of contractual provisions found in American General Finance v. Branch are not here present.

C. Unequal Bargaining Power Among the Parties
Potts argues: "To say that the Baptist Health System stands in a superior bargaining position to Potts is an understatement. They held the keys to her job and her ability to feed her family." However, Potts provided no evidence showing how her situation is different from any other contract of at-will employment. As this Court stated in Ex parte Michelin North America, Inc., 795 So.2d 674, 677 (Ala.2001):
"In Alabama, an employment relationship is ordinarily `at will,' and the fundamental principle of employment at will is that the employment relationship is terminable by either party at any time and for any reason. Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725, 728 (Ala.1987); Hinrichs v. Tranquilaire Hosp., 352 So.2d 1130, 1131 (Ala.1977). Thus, Alabama is what is commonly known as an `employment-at-will' state."
Therefore, the possibility of termination flowing from Potts's refusal to sign an acknowledgment form is not, in and of itself, unconscionable. Moreover, although Potts argues that her family would suffer financial hardship if she failed to sign the acknowledgment and was then fired, Alabama law does not allow a mere showing of financial hardship to invalidate an arbitration agreement. Regarding this issue, this Court stated in Green Tree Financial Corp. v. Wampler, 749 So.2d 409, 416 (Ala.1999):
"We have previously acknowledged that the FAA, 9 U.S.C. § 2, binds us to faithfully apply general principles of Alabama contract law when considering a challenge to the validity of an arbitration agreement. Because the general principles of Alabama contract law do *207 not excuse performance on the grounds of financial hardship, we cannot allow a party's poverty, standing alone and independent of other considerations justifying a finding of unconscionability, to constitute a defense to enforcement of an arbitration agreement."

D. Oppressive or Unfair Terms in the Contract
Potts does not assert that the contract contained oppressive or unfair terms. Instead, she argues generally only that, "[i]n this case, the very existence of the contract and the circumstances surrounding the obtaining of it are so grossly oppressive as to require relief." As mentioned earlier in this opinion, the dispute-resolution program provides procedures by which a dispute may be resolved by the parties, without first resorting to arbitration. The program also allows the employee to be represented at arbitration hearings, provides for discovery, and does not purport to limit damages as the arbitration agreement in American General Finance v. Branch did.
Moreover, regarding the costs of arbitration, the dispute-resolution program provides that "BHS agrees to pay the administrative and hearing fees attributable to the arbitration (other than the $50 initiation fee) and the Arbitrator's daily rate and expenses, unless the employee objects, in which case the parties will share the cost equally." Therefore, based on the facts and arguments before us, we are unable to say that the program contains oppressive or unfair terms.
For these reasons, Potts has not provided the type of evidentiary showing that this Court was presented with when it held the arbitration clause unconscionable in American General Finance v. Branch. Accordingly, this Court is unable to conclude that the circumstances surrounding Potts's acceptance of continued employment with the defendants were unconscionable. Thus, the judgment of the trial court is affirmed.
AFFIRMED.
HOUSTON, BROWN, WOODALL, and STUART, JJ., concur.
SEE, J., concurs in the result.
MOORE, C.J., and LYONS and JOHNSTONE, JJ., dissent.
LYONS, Justice (dissenting).
The two more compelling arguments in favor of Potts's employment agreement's having a substantial effect on interstate commerce relate to the defendants' furnishing Potts medical equipment and supplies flowing in interstate commerce and the receipt by the defendants of "hundreds of thousands of dollars annually from out-of-state insurance carriers, health maintenance organizations, and employee welfare benefit plans, as reimbursement for patient care." However, we are not given any relationship between the total amount paid for medical equipment and supplies and the amount paid to Potts as salary, nor are we given the relationship between the revenue the hospital derived from interstate reimbursement for patient care and its total revenue. Evidence indicating that the defendants purchased equipment and supplies moving in interstate commerce and received out-of-state reimbursement for patient care, without quantification or application to Potts's situation, is inadequate to support a finding that her employment agreement had a substantial effect on interstate commerce. Liberty Nat'l Life Ins. Co. v. Douglas, 826 So.2d 806 (Ala.2002). See also Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000).
*208 The issue here is very difficult because if the evidence were properly developed, a substantial effect on interstate commerce would probably be demonstrated. Nevertheless, I am reluctant to apply the concept of judicial notice to this issue. Rule 201(b), Ala. R. Evid., does not apply to the kind of facts before us in this case.
"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."
I respectfully dissent.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. The plaintiff Potts's employment contract with the defendants does not substantially affect interstate commerce, and the main opinion contravenes our binding precedents in its holding that the employment contract does substantially affect interstate commerce.
The main opinion overlooks the most applicable holdings of Alafabco, Inc. v. Citizens Bank, [Ms. 1010703, Aug. 30, 2002] ___ So.2d ___, ___ (Ala.2002):
"Thus the facts that the Bank `routinely conducts business in interstate commerce'; that Alafabco owns and uses materials `manufactured outside the state of Alabama'; and that Alafabco operates its business with funds borrowed from the Bank cannot support arbitrability of this dispute.

"Moreover, under §§ 1 and 2, the FAA applies only where the transaction affecting interstate commerce is the `subject of [the] controversy.'"

(Emphasis added.) The contract to be judged for its substantial effect, or want thereof, on interstate commerce is Potts's employment contract, exclusively between and among Alabama resident parties exclusively for services to be rendered exclusively inside Alabama for wages exclusively earned, paid, and received in Alabama. The main opinion, however, relies entirely on the myriad of separate and distinct interstate contracts between the defendants and out-of-state entities unrelated to the plaintiff. None of these contracts between the defendants and entities unrelated to the plaintiff "is the `subject of [the] controversy.'" Id. Thus, while the main opinion recognizes the Alafabco holding that "[t]he FAA focuses on the narrow concepts of acts, omissions, or agreements, not on the broader concepts on which the Bank focuses, such as the nature of the parties' businesses," 853 So.2d at 202 (emphasis added), the main opinion still misplaces the focus on the nature of the defendants' businesses.
The main opinion does recognize the holding of Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759, 766-67 (Ala.2000), that separable interstate contracts do not impart their interstate effects to the contract that grounds the controversy between the parties. To avoid this holding, however, the main opinion relies on factual conclusions not supported by the record. The main opinion says, "Potts's employment could not have continued without the constant flow into Walker Medical of the interstate stream of supplies indispensable to the performance of Potts's duties as a registered nurse." 853 So.2d at 203. Likewise, the main opinion says, "As already noted, Potts's performance of her employment duties was necessarily dependant upon the various contracts BHS had with its network of [interstate] suppliers." 853 So.2d at 204. The defendants, however, do not even claim, much less prove, that they could not or would not have employed Potts or continued her employment if they could not or *209 did not obtain these particular supplies from these particular sources or from out-of-state sources in general, or, indeed, if they could not or did not obtain these supplies at all.
Moreover, Sisters of the Visitation holds that distinct interstate contracts are separable from the contract grounding the dispute unless "the delays or distractions attendant to litigation, as opposed to the ostensibly simpler mode of dispute resolution afforded by arbitration, would disrupt the performance of the other contracts that have a substantial effect on interstate commerce." 775 So.2d at 767. The defendants presently before us do not even pretend that litigating, as distinguished from arbitrating, with Potts would, to any extent at all, "disrupt the performance of the other contracts that have a substantial effect on interstate commerce." Indeed, such a pretense would be absurd.
Finally, while the main opinion recognizes the allocation-of-costs factor adopted by Sisters, 775 So.2d at 765-66, the main opinion seems to misconstrue this factor and to misapply it to the facts. For the use of out-of-state materials in a service contract to impart a substantial interstate feature to the contract, about half of what is paid to the party performing the service must be allocable to the interstate materials. Id. While, as the main opinion states, between fifty percent and ninety percent of the materials used by Potts in performing her services may have come from out of state, the record does not reveal the cost of the materials used by Potts, and therefore the record does not support any comparison between Potts's wages and the cost of the out-of-state materials used by Potts in performing her services. Even if a hundred percent of the materials used by Potts came from out of state, the interstate feature of these materials would not, according to Sisters of the Visitation, 775 So.2d at 765-66, impart a substantial interstate effect to Potts's employment contract unless the cost of those materials approximately equaled or exceeded Potts's wages. (The Sisters of the Visitation analysis hypothesizes an employee farmer who is paid for both his services and the out-of-state materials he buys and uses in performing his services, while in the case before us the defendants themselves bought all of the materials and paid Potts solely for her services.) Because the record does not reveal the cost of the out-of-state materials used by Potts, and indeed does not even reveal the amount of Potts's wages, this Court cannot legitimately conclude that an allocation of the costs of those materials, in comparison to the wages paid to Potts, imparts to Potts's employment contract a substantial effect on interstate commerce. Liberty Nat'l Life Ins. Co. v. Douglas, 826 So.2d 806 (Ala.2002).
While the United States Congress, to the extent of the authority granted by the Commerce Clause, may formulate policy and impose it on the states and their citizens, such policy does not apply to transactions or contracts that are beyond or outside the ambit of that constitutional authority. Sisters of the Visitation, 775 So.2d at 767-71 (Johnstone, J., concurring). The Tenth Amendment to the United States Constitution reserves to the sovereign states the authority to govern transactions and contracts that are beyond or outside the Commerce Clause. Id. The Congress wages a continual assault on this state sovereignty. See, e.g., United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). This Court gratuitously surrenders the sovereignty of Alabama to this assault whenever this Court, without the compulsion of binding precedent, or, even worse, against the holdings of binding precedent, decides that a contract *210 substantially affects interstate commerce and therefore incurs the governance of the Federal Arbitration Act at the expense of the contrary policy adopted by the Alabama Legislature in enacting § 8-1-41(3), Ala.Code 1975, prohibiting the specific enforcement of predispute arbitration agreements. Today's decision is such a surrender, and one that will have drastic consequences to the people of this State.
NOTES
[1] In her complaint Potts alleged that she "is a registered nurse in Alabama and was an employee of Defendant corporations for four years and four months, more or less."
[2] The identities of the individual defendants are not relevant to our disposition of this case.
[3] At page 5 of their brief to this Court, BHS and Walker Medical assert that Walker Medical, along with several other hospitals, is a subsidiary of BHS. Although the record does not precisely address this point, it does support this inference, and Potts makes no statement to the contrary. Thus, our analysis proceeds on the inference, implicit in the parties' briefs to this Court and explicit in Potts's statement quoted in note 1 that she "was an employee of Defendant corporations," that Potts was employed by both BHS and Walker Medical.
[4] "When a trial court enters an order compelling arbitration, a stay of the proceedings in the trial court during the pendency of the arbitration protects the plaintiff from facing the prospect of the expiration of an applicable statute of limitations or from paying another filing fee in the event future legal proceedings become necessary. An order compelling arbitration should not constitute an adjudication on the merits; therefore, a trial court should not dismiss... a case in which arbitration is ordered."

Mostella v. N & N Motors, 840 So.2d 877, 880 (Ala.2002). Although this Court disfavors the dismissal of cases in which a motion to compel arbitration has been granted, and instead favors a stay of those cases, the parties do not argue this issue on appeal; consequently, we do not address the issue further.
[5] The record contains affidavits, presented by the defendants, from the following persons: Bobby J. Davenport, vice president of support services at Walker Medical; Marvin Wayne Burns, director of materials management at Walker Medical; Cynthia Key, a registered nurse at Walker Medical; and Tom Sanders, senior vice president of human resources and administration for BHS.
[6] In compiling the materials from the affidavits, we have grouped factually similar material together in a single paragraph, although we may have extracted the material from two or more affidavits.