(110 So. 614)

## ALABAMA CHEMICAL CO. v. INTERNATIONAL AGRICULTURAL CORPORATION. (3 Div. 771.)

(Supreme Court of Alabama. Oct. 14, 1926. Rehearing Denied Jan. 6, 1927.)

1. Sales ⬤�439;72(4)—Under contract for sale of phosphate, making certain chemist's decision as to chemical analysis thereof final, chemist's decision is only assailable for fraud or flagrant disregard of duty amounting to fraud.

Under contract for sale of phosphate to be manufactured into fertilizer, providing that decision of certain chemist, selected as umpire, as to chemical analysis of phosphate should be final, umpire's decision cannot be assailed for mistake but only for fraud or flagrant disregard of duty, or for adoption of construction of contract known to be wrong, amounting to fraud.

2. Pleading ⬤�439;8(15)—In action on note given for rock phosphate under contract making decision of chemist final, pleas alleging gross mistake and fraud in chemical analysis, without specifying wherein fraud consisted, held insufficient.

In action on note given for phosphate rock to be used in manufacturing fertilizer, under contract making decision of chemist as to chemical analysis final, pleas alleging gross mistake and fraud by chemist in general terms, without alleging wherein method of analysis or misconstruction of contract was fraudulent, held insufficient.

Appeal from Circuit Court, Montgomery County; Walter B. Jones, Judge.

Action by the International Agricultural Corporation against the Alabama Chemical Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Hill, Hill, Whiting, Thomas & Rives and Ball & Ball, all of Montgomery, for appellant.

A stipulation in a contract providing a reasonable method of estimating and ascertaining the amount of loss is not valid, if it undertakes to oust the jurisdiction of the courts to determine the general question of liability. Hamilton v. Liverpool Ins. Co., 136 U. S. 242, 10 S. Ct. 945, 34 L. Ed. 419; Headley v. Ætna Ins. Co., 202 Ala. 384, 80 So. 466; Cassels v. Ala. City, etc., Co., 198 Ala. 250, 73 So. 494. It must appear that the parties agreed to such stipulation. Abercrombie v. Vandiver, 126 Ala. 532, 28 So. 491. Awards of findings may be attacked for fraud or gross mistake on the part of the arbitrators. 4 Page, Cont. § 2550; Central of Georgia R. Co. v. Isbell, 198 Ala. 469, 73 So. 648. There is no estoppel against the maker of a note, if he did not know of defects in consideration when he executed it. 8 C. J. 724; 35 Cyc. 433; Wood v. Fowler, 37 Ala. 55.

Marion Smith, of Atlanta, Ga., and Steiner, Crum & Weil, of Montgomery, for appellee.

In the absence of fraud or bad faith on the part of the chemists, their analyses are binding upon the parties to the contract. 6 R. C. L. 956; Shriner v. Craft, 166 Ala. 146, 51 So. 884, 28 L. R. A. (N. S.) 450, 139 Am. St. Rep. 19; Catanzano v. Jackson, 198 Ala. 302, 73 So. 510; Martinsburg & P. R. Co. v. March, 114 U. S. 549, 5 S. Ct. 1035, 29 L. Ed. 255; 13 C. J. 680. Where there is an express warranty, there can be no implied warranty. Little-Cleckler Const. Co. v. Sonneborns Sons, 17 Ala. App. 216, 84 So. 548. Execution of the note entitled plaintiff prima facie to recover. United States v. Robeson, 9 Pet. 319, 9 L. Ed. 142; Western Assur. Co. v. Hall, 112 Ala. 318, 20 So. 447; Headley v. Ætna Ins. Co., 202 Ala. 384, 80 So. 466.

BOULDIN, J. The suit is upon a promissory note given for certain shipments of Florida land pebble phosphate rock for use in the manufacture of commercial fertilizer. The theory of the defense is that the product shipped was defective in quality for lack of content of bone phosphate of lime stipulated in the written contract of sale, for which defendant claims an abatement of the price equal to the unpaid balance of the note sued upon.

The pleadings raising the issues are voluminous, but our labors are reduced by a thoughtful concession on both sides that the controlling questions turn upon the legal construction of the contract. The pertinent provisions of the contract are:

"*Quantity.*—The buyer agrees to purchase and receive, and the seller agrees to sell and deliver, under the terms and conditions hereinafter set forth, a total of twenty-four thousand (24,000) tons of Florida land pebble phosphate rock of 2,240 pounds each.

"*Quality.*—The phosphate to be delivered under this contract is sold on the basis of 68 per cent. bone phosphate of lime, dry basis, and not more than 4 per cent. combined oxide of iron and alumina (when determined separately on dry basis), and not more than 3 per cent. moisture.

"*Price.*—The price shall be four dollars and seventy-five cents ($4.75) per ton of 2,240 pounds f. o. b. cars at seller's mines, Mulberry, Florida, for rock testing 68 per cent. bone phosphate of lime on a dry basis; with an increase in price at the rate of 7 cents per unit, fractions in proportion, for any official analysis in excess of 68 per cent. B. P. L. and a corresponding reduction in price, if below 68 per cent. down to and including 66 per cent. absolute minimum B. P. L., with an additional charge of $2.50 per box car for furnishing car door boards and labor installing same in car. Seller however not to charge for any excess B. P. L. above 70 per cent. * * *

"*Sampling and Analysis.*—An average sample representing the cars shipped during each calendar month shall be made, unless otherwise mutually agreed upon by the buyer and seller, in accordance with the following method: Seller shall take sample from each car at time of shipment. At the end of the month in which samples are taken, or upon the completion of the shipment ordered, if such shipment is completed before the end of the month, seller shall make an average sample in triplicate from the samples so taken; one sample to be sent at once to Messrs. Gascoyne & Co., Baltimore, Md., for account of seller and one to Shuey Laboratory, Savannah, Ga., for account of buyer, the third sample to be held for referee. Each chemist to send certificate of analysis at once to both seller and buyer, and settlement to be based on the mean of the two results, provided the difference between these chemists does not exceed one per cent. Bone phosphate of lime or one-half of one per cent. combined oxide of iron and alumina. Should such an excess difference exist between seller's and buyer's chemists, the third sample shall be sent to Messrs. Wiley & Co., Inc., Baltimore, Md., as referee for analysis of the ingredient at fault, and the mean of the two nearest of the three results obtained shall be accepted as final. Each party to pay his own chemist, cost of referee to be equally divided.

"Buyer shall have privilege of maintaining a representative at mines to check all weighing and sampling, and in such case settlement shall be based on the samples and weights as checked by such representative.

"*Terms of Payment.*—Payment for all phosphate rock delivered under this contract shall be made in New York funds on or before the 10th of each month for shipments made the previous month at the contract price of $4.75 per gross ton, adjustment to be made promptly upon receipt of analysis. * * *

"It is understood and agreed that the phosphate rock purchased under this contract is for buyer's own consumption and for shipment to buyer's works at Savannah, Ga., Valdosta, Ga., Montgomery, Ala. * * *

"Buyer to have privilege of settling for shipments of phosphate rock under this contract by giving four months' note with interest at six per cent. (6 per cent.) from the 10th of the month following shipments."

It would be difficult to express the intent of the parties more clearly and exactly than in the language chosen by them. The rock was sold upon a prescribed standard of quality, an "absolute minimum" in content of bone phosphate of lime. Any shipment below the minimum was without the terms of the contract. Deliveries were conditioned upon the shipment coming within the standard of quality. Upon ascertainment in the manner provided that the product was without the terms of the contract, the buyer was free to reject and return it. If he elected to retain it, or had consumed it before acquiring knowledge of the fact, an implied contract arose to pay the reasonable market value of same.

The price was fixed on a basis grade with differentials for greater or less content bone phosphate of lime, subject to the absolute minimum. The major questions arise under

the stipulations for "sampling and analysis." It is a form of sale upon or subject to inspection; inspection by third persons chosen by the parties for their special knowledge and equipment; the method of inspection by chemical analysis of samples selected subject to check of a representative of the buyer. Special care is taken in that the accepted and final inspection is made the resultant of the reports of two chemists, chosen by each party, acting independently, and subject to further correction by report of a third chemist chosen as referee in case of a difference of 1 per cent. in the reports of the two.

[1] Such provisions are within the power of the parties to contract. Where the contract expressly declares, or clearly imports an intention, that the decision of the chosen agency shall be final, it is final as other terms of the contract and subject to be avoided on similar grounds; not technically an arbitration to settle dispute already arisen, but to forestall disputes, and to have the aid of expert knowledge in the conduct of a business requiring it. Mere mistake or error in the decision of the umpire does not avoid it; if so, the purpose of the stipulation would fail, the right of contract denied, and the chosen means of avoiding controversy made the breeder of litigation. The importance of such provisions in the conduct of many lines of present day business demands that they be annulled only upon substantial and well-established legal grounds.

Like other transactions, the decision of the referee may be assailed for fraud. A report known by him to be false, working substantial injury to a party relying thereon, is a fraud. In assuming the duties of referee an element of trust is present. Hence, such flagrant disregard of duty as results in a decision not expressive of an honest judgment is a decision in bad faith, tantamount to a fraud. A gross error or mistake, working injury to a party, is evidential matter from which bad faith may be inferred or implied. The gravamen of the charge is bad faith, failure to form or express an honest judgment, with consequent injury. Abercrombie & Williams v. Vandiver, 126 Ala. 513, 28 So. 491; Central of Ga. R. Co. v. Isbell, 198 Ala. 469, 73 So. 648; Catanzano v. Jackson, 198 Ala. 302, 73 So. 510; Shriner v. Craft, 166 Ala. 146, 51 So. 884, 28 L. R. A. (N. S.) 450, 139 Am. St. Rep. 19; Martinsburg v. March, 114 U. S. 549, 5 S. Ct. 1035, 29 L. Ed. 255; Brooke v. Laurens Milling Co., 78 S. C. 200, 58 S. E. 806, 125 Am. St. Rep. 780; 23 R. C. L. p. 1363, § 185; 6 R. C. L. p. 956, § 335.

[2] Plea E makes the contract an exhibit, avers that the note in suit was given on incorrect invoices sent by the seller, that their incorrectness was not known to defendant at the time, and proceeds:

"That said invoice was not correct by reason of the fact that it was calculated upon the reports of the chemists named in said contract, but said reports were incorrect because said chemists committed gross mistakes therein in this: That said rock contained calcium phosphate, iron phosphate, aluminum phosphate and magnesium phosphate; that said chemists knowingly failed to determine the true amount of bone phosphate of lime in said rock, but either determined or assumed the gross amount of phosphoric acid in said combination and made theoretical calculations therefrom of the amount of bone phosphate of lime which said rock would have contained if all of said phosphoric acid had been combined therein with calcium only in the form of bone phosphate of lime, which condition they knew did not exist; and they reported said theoretical result as a percentage of bone phosphate of lime in said rock instead of the true percentage thereof which was less than 66 per cent. of said rock."

Plea I alleges:

"That said invoice was not correct by reason of the fact that it was calculated upon the reports of the chemists named in said contract; but said reports were incorrect because said chemists committed fraud therein in this: That said rock contained calcium phosphate, iron phosphate, aluminum phosphate, and magnesium phosphate; that said chemists fraudulently failed to determine the true amount of bone phosphate of lime in said rock, but either determined or assumed the gross amount of phosphoric acid in said combinations and made theoretical calculations therefrom of the amount of bone phosphate of lime which said rock would have contained if all of said phosphoric acid had been combined therein with calcium only in the form of bone phosphate of lime, which condition they knew did not exist; and they reported said theoretical result as a percentage of bone phosphate of lime in said rock instead of the true percentage thereof which was less than 66 per cent. of said rock."

These pleas, taken as a whole, fail to show that the method employed by the chemists in finding the percentage of bone phosphate of lime was in bad faith or not expressive of an honest judgment.

While averring they knew the rock did not contain 66 per cent. of calcium phosphate, it is not averred they knew the other phosphates to the extent present were not allowable in figuring the content of bone phosphate of lime as a commercial product found in Florida land pebble rock. The pleas indicate a controversy as to what constitutes bone phosphate of lime in the sense used in the contract.

Appellant really relies upon a misconstruction of the contract by the chemists. By the selection of named experts for the particular service, the parties contract that they are competent to perform the service. This implication of the contract is binding as other features. To reopen all such transactions upon a question of construction of terms within expert knowledge would entail all the evils the stipulation aims to avoid. The

same test must be applied to this as to other features of the report. If the chemists adopt a construction known to be wrong, or from indifference or bias fail to exercise and report an honest judgment, resulting in serious injury and loss, the report must be regarded as in bad faith. The pleas charge fraud in general terms, but proceeding to set forth wherein the fraud consists fail to show the method employed, or alleged misconstruction of the contract, was fraudulent.

Pleas A-5 and A-6 are in set-off or recoupment, based upon the allegation that the rock shipped was defective in quality or not merchantable, facts not known at the time the note was given, and left open in former settlements to future litigation.

Replications setting up the contract and averring that the rock was shipped and note given therefor pursuant to its terms would authorize proof of the report of the chemists and the giving of the note pursuant thereto. These were a complete answer to the pleas as framed, and cast on defendant the burden to aver and prove fraud in the report of the chemists.

General pleas of failure of consideration, or for misrepresentation or breach of warranty based on defect in quality by reason of deficiency in content of bone phosphate of lime, would be fully met by the contract and report of chemists. The only available defense under the admitted facts was to impeach the report of the chemists upon legal grounds. Hence, rulings on these sundry pleadings were without injury.

Affirmed.

SAYRE, GARDNER, and MILLER, JJ., concur.

On Rehearing.

BOULDIN, J. We have carefully considered the briefs on application for rehearing. We adhere to the view that chemists chosen as arbitrators were to ascertain the true content of bone phosphate of lime, and thus determine whether the shipment was within the terms of the contract, as well as the differentials under the contract.

On this application stress is laid on plea "A-9" as a sufficient plea of fraud. We have re-examined the briefs, both original and supplemental, filed for our consideration by the appellant on the hearing, and the court is of the opinion that the plea was not then sufficiently argued nor insisted upon to merit a special treatment or decision thereon. The decision dealt with and covered the substantial questions presented.

Application overruled.

SAYRE, GARDNER, and MILLER, JJ., concur.