870 So.2d 699 (2003)
BOARD OF WATER & SEWER COMMISSIONERS OF THE CITY OF MOBILE
v.
BILL HARBERT CONSTRUCTION COMPANY.
1012198.
Supreme Court of Alabama.
June 27, 2003.
*700 E.J. Saad, James E. Atchison, and Frank G. Taylor of Atchison, Crosby, Saad & Beebe, P.C., Mobile, for appellant.
Susan S. Wagner and James H. White of Berkowitz, Lefkovits, Isom & Kushner, P.C., Birmingham, for appellee.
HARWOOD, Justice.
This appeal, taken pursuant to Rule 4(d), Ala.R.Civ.P., is from an order denying a motion to compel arbitration.
On December 15, 1999, Bill Harbert Construction Company ("Harbert") sued the Board of Water & Sewer Commissioners of the City of Mobile ("the Board"), Federal Insurance Company ("Federal"), and Sika Corporation ("Sika"). Harbert's various claims arose from its termination as contractor on two public works projects in Mobile involving the construction of water mains, sanitary sewers, and sewage pump stations. Harbert amended its complaint to add as defendants various project design engineers, subcontractors, and related insurers and to assert further claims against the Board. After further pleadings and extensive discovery, the Board, on April 15, 2002, filed motions "To Confirm and Enforce the Arbitrator's Decisions,"[1] and, in the alternative, to "Enforce *701 Arbitration Concerning Contracts" ("the arbitration motions"). The Board asserted that the construction contracts it had entered into with Harbert, both of which incorporated paragraph 5.01 of the Standard Specifications for Water Mains, Sanitary Sewers, and Sewage Pump Stations ("the standard specifications"), vested authority in the project engineer to arbitrate the matter. The Board supported the arbitration motions with documentary evidence and deposition testimony. The arbitration motions were briefed to a special master appointed by the trial court, and the special master issued a detailed report determining that the contracts did not contain an arbitration clause. On August 19, 2002, the trial court entered an order adopting the findings of the special master, and the Board appealed.
The dispositive issue in this appeal is whether the trial court erred in denying the arbitration motions on the basis that the construction contracts, and specifically paragraph 5.01 of the standard specifications incorporated into those contracts, did not contain an arbitration clause.

Facts
In 1992, the Board entered into a contract with the engineering firm of BCM Converse, Inc. ("BCM"),[2] to provide design, consulting engineering, and construction services for modifications and improvements to the Board's Clifton C. Williams Wastewater Treatment Plant ("Project 15") and for modifications and improvements to the sludge-treatment facility at the same plant ("Project 16"). Harbert entered into two construction contracts with the Board, one for Project 15 and one for Project 16, in December 1994 and January 1995, respectively. The contract for Project 15 was entitled the Clifton C. Williams WWTF Upgrade and Modifications BCM Project XX-XXXX-XX ("Contract 15"), and the contract for Project 16 was entitled the Sludge System Upgrade, BCM Project XX-XXXX-XX ("Contract 16"). Harbert was to be paid $11,106,963.39 under Contract 15, and $1,298,125.79 under Contact 16.
After undertaking work pursuant to Contract 15, Harbert determined that reactor basin # 2 specified under that contract was unable to pass a pressure test as required by the plans and specifications because the Sikadur Combiflex System, manufactured by Sika and intended to be the sealant system under the plans and specifications, was unsuitable for that purpose. Harbert recommended an alternative system, but BCM, as project engineer, rejected that alternative on the ground that BCM had determined that the Sikadur Combiflex System was suitable as the sealant system for reactor basin # 2. BCM attributed the failure of reactor basin #2 to pass the pressure test to the failure of Harbert and its subcontractor, Spiderman's Professional Services, Inc. ("Spiderman"), to construct and install the sealant system properly. Disputes between Harbert and BCM also arose with respect to work under Contract 16 concerning centrifuges installed by Harbert. On BCM's recommendations the Board eventually terminated Harbert's participation in the projects and called on Federal, the surety on the performance bond, to complete the work under Contract 15 and Contract 16.
Harbert brought the instant action seeking damages in excess of $3,000,000 on *702 claims of breach of contract and breach of what it characterized as "the implied warranty of reasonable results," and seeking a declaratory judgment. Harbert alleged that the plans and specifications for Project 15 were defective because, it said, the sealant system was not suited for its intended purpose. Harbert further alleged that the Board had terminated its participation on Project 15 and Project 16 in order to avoid responsibility for the design error. Harbert also asserted claims against BCM, but that aspect of the action has been stayed because of bankruptcy proceedings involving BCM and its insurers. Harbert also asserted claims against Spiderman; those claims have been settled.
The Board filed various counterclaims against Harbert asserting theories of breach of contract, breach of warranty, negligence, and fraud. The Board has also filed a third-party complaint against Federal on theories that Federal had breached its obligations under the performance bonds, and the Board filed cross-claims against Sika on theories of breach of warranty.
The standard specifications are included among the provisions contained in the various documents that constitute Contract 15 and Contract 16. Section 5 of the standard specifications is entitled "Control of Work" and contains the following provision:
"5.01 AUTHORITY OF THE ENGINEER:
"To prevent misunderstandings, disputes, and litigation, the Engineer shall decide any and all questions which arise concerning the quality and acceptability of materials furnished and work performed, the rate of progress of the Work, interpretation of the Plans and Specifications, and the acceptable fulfillment of the Contract on the part of the Contractor. The Engineer will determine the amount, quantity, classification, and quality of the several kinds of work performed and materials furnished which are to be paid for under the Contract and his decision and estimate shall be conclusive and binding on both parties thereto and such decision and estimate of the Engineer, in case any questions arise, shall be a condition precedent to the right of the Contractor to receive any money due him under the contract. Explanations concerning the meaning of the Plans and Specifications and Contract, all directions necessary to complete or make definite the Plans, Special Provisions, Specifications or Contract and to give them due effect will be given by the Engineer and his findings shall be final and binding on both parties hereto. The Engineer shall have authority to enforce and make effective decisions and orders as apply to conformance with the Contract. He shall decide disputes and mutual rights between Contractors.
"Notwithstanding any general clauses, wording, paragraphs, or other references contained in the Plans, Specifications, General Conditions, or elsewhere in the Special Provisions, the Engineer and his Resident Project Representative are not charged with the responsibility of directing the actual procedures and detail methods of construction to be used by the Contractor in accomplishing the Work contained in the contract between the Owner and the Contractor nor is the Engineer responsible to act as superintendent, foreman, or safety engineer for the contract, nor for the safety of the contractor's personnel."
The parties do not dispute that the "Engineer" referenced in paragraph 5.01 is BCM. In the arbitration motions, the Board asserted that this paragraph is *703 properly construed as an arbitration agreement, and that under paragraph 5.01, the Engineer's decisions and dispositions under the contracts are final and binding and therefore foreclose Harbert's claims. Alternatively, the Board asserts that claims not otherwise resolved by the Engineer must, under this paragraph, be arbitrated by the Engineer.

Discussion
Our standard for the review of the grant or denial of a motion to compel arbitration is settled.
"This Court reviews the denial of a motion to compel arbitration de novo. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala.1999); Patrick Home Ctr., Inc. v. Karr, 730 So.2d 1171, 1172 (Ala.1999). The party seeking to compel arbitration has the initial burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction substantially affecting interstate commerce. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999); Sisters of the Visitation v. Cochran, 775 So.2d 759 (Ala. 2000). `[A]fter a motion to compel arbitration has been made and supported, the burden is on the nonmovant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (opinion on application for rehearing) (Ala.1995)."
American Gen. Fin. Inc. v. Morton, 812 So.2d 282, 284-85 (Ala.2001).
In this case we focus upon whether paragraph 5.01 constitutes an agreement to arbitrate the disputes that arose under Contract 15 and Contract 16.
"[I]n determining whether the parties agreed to arbitrate a dispute, this Court `should apply ordinary state-law principles that govern the formation of contracts.' First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); accord Quality Truck & Auto Sales, Inc. v. Yassine, 730 So.2d 1164, 1167-68 (Ala. 1999). Consequently, `in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [Federal Arbitration] Act, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.' Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 475-76, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (citation omitted).
"However, the federal policy favoring arbitration does not require this Court to ignore the contractual intentions of the parties. See Volt Information Sciences, Inc., 489 U.S. at 478-79, 109 S.Ct. 1248; Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Instead, `[t]his Court has clearly and consistently held that a party cannot be required to submit to arbitration any dispute he has not agreed to submit.' Ex parte Stallings & Sons, Inc., 670 So.2d 861, 862 (Ala.1995) (internal quotation marks and citations omitted); accord AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). The [Federal Arbitration Act] `simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms,' and `parties are generally free to structure their arbitration agreements as they see fit.' Volt Information Sciences, Inc., 489 U.S. at 478-79, 109 S.Ct. 1248. Accordingly, `as with *704 any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.' Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)."
Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 745-46 (Ala.2000).
The report of the special master did not cite legal authority from Alabama exactly on point with this case; neither have the parties cited such authority in their arguments to this Court, and our research has discovered none. The special master's analysis, which concluded that paragraph 5.01 could not be construed as an arbitration agreement, began with the recognition that provisions in construction contracts analogous to paragraph 5.01 have historically not been treated as arbitration provisions. See generally Annot., Conclusiveness of Certificate or Decision of Architect or Engineer Under Building or Construction Contract, 54 A.L.R. 1255 (1928), supplemented by 110 A.L.R. 137 (1937). The special master relied to a considerable extent on the New York cases of Thomas Crimmins Contracting Co. v. City of New York, 138 A.D.2d 138, 530 N.Y.S.2d 779 (1988)("Crimmins I"), affirmed, 74 N.Y.2d 166, 544 N.Y.S.2d 580, 542 N.E.2d 1097 (1989)("Crimmins II").
In Crimmins I, a subway construction contractor sued the City of New York and the City's transit authority (hereinafter referred to collectively as "the City") seeking to recover expenses incurred as the result of unexpected construction conditions and extra work expenses that the supervising engineer had denied. Approximately five years after the filing of the action, the City interposed as an affirmative defense that the construction contract contained a dispute-resolution provision that made the decisions of the chief engineer of the transit authority, the very decisions being challenged in the action, final and binding on the contractor. The trial court determined that the dispute-resolution provision did not bar the contractor's claims, and the City appealed to the Appellate Division of the New York Supreme Court, New York's intermediate appellate court. The dispute-resolution provision at issue stated:
"`To prevent disputes and litigations, the Engineer shall in all cases determine the classification, amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract, shall determine every question in relation to the Works and the construction thereof and shall determine every question which may be relevant to the fulfillment of this contract on the part of the Contractor. His determination and estimate shall be final and conclusive upon the Contractor, and in case any question touching this contract shall arise between the parties hereto such determination and estimate shall be a condition precedent to the right of the Contractor to receive any money under this contract.'
"138 A.D.2d at 140, 530 N.Y.S.2d at 780. The construction contract defined the "Engineer" in the above provision as the chief engineer of the transit authority.
The Appellate Division, New York's intermediate court of appeals, addressed the City's argument with a review of the courts' past treatment of such provisions:
"We begin our discussion of the merits with the observation that it has been a long established practice, one which originated with government works' contracts, to provide in construction contracts that the completion, sufficiency, classification, and amount of the contractor's work be determined by a third person, usually the owner's architect or *705 engineer, who typically issues the Final Certificate, certifying completion and adequacy of the work performed, and who the contract often authorizes to resolve work disputes. See generally 22 N.Y.Jur.2d, Contracts, §§ 297-303.
"As early as 1859, the Court of Appeals, in reviewing a clause giving the defendant railroad's engineer broad authority to `decide every question ... between the parties, relative to the execution [of the contract],' upheld the legitimacy of such `common' dispute resolution clauses and described their purpose as `... to prevent disputes in regard to the amount and character of the work performed; and to secure the accuracy of all measurements and calculations, by having competent persons to make them.' McMahon v. The New York and Erie Railroad Company, 20 N.Y. 463, 465 [ (1859) ]. Given the limited effect of these clauses, they have not been deemed assailable because the engineer was employed by the governmental body for whom the construction is being performed, nor because the engineer's determinations are made final only as to the contractor. See e.g., O'Brien v. Mayor [of New York], 139 N.Y. 543, 576-577, 35 N.E. 323 [(1893) ].
"Although some cases construing the scope and effect of such dispute resolution clauses have drawn parallels to arbitration clauses and have loosely termed the architect or engineer an arbitrator, determinations made pursuant to these clauses have not been subjected to the limited judicial review accorded to arbitrators' decisions pursuant to CPLR Article 75, but instead have been reviewed pursuant to judicially created rules, as set forth in Joseph Davis, Inc. v. Merritt-Chapman & Scott Corp., 27 A.D.2d 114, 276 N.Y.S.2d 479 [(1967)].
"`The extent of the right of a third party, such as the Authority's engineers, to bind the parties by their determination is well settled. If a contract provides that the decision or determination of an engineer shall be final and binding, such finality attaches, in the absence of fraud, bad faith or palpable mistake equivalent to bad faith, only to those determinations involving quantity or quality of material, classification or amount of work performed, or a calculation as to a final estimate; where the expertise of the engineer is important and essential (Sweet v. Morrison 116 N.Y. 19 [22 N.E. 276 (1889)]; Yonkers Contr. Co. v. New York State Thruway Auth., 26 A.D.2d 766 [271 N.Y.S.2d 855 (1966)]; Dowd v. State of New York, 239 App.Div. 141, 142 [267 N.Y.S.2d 358 (1933)]). In short, the resolution of factual disputes is the prerogative of the engineers. Absent any question of construction of the contract, the engineers' determination could not be challenged. They do not, however, have the power to construe the contract (see, generally, Ann. 137 A.L.R. 530; 10 N.Y.Jur., Contracts, §§ 155-156). The cases cited above are distinguishable from those situations where the meaning of the terms is to be construed and where the court's responsibility for construction cannot be assumed by the engineers so as to oust the court of jurisdiction (Daniels Co. v. City of New York, 196 App.Div. 856 [188 N.Y.S. 716 (1921)]; Merrill-Ruckgaber Co. v. City of New York, 160 App.Div. 513 [145 N.Y.S. 577 (1914)]; Uvalde Contracting Co. v. City of New York, 160 App.Div. 284 [145 N.Y.S.2d 604 (1914)]; Burke v. Mayor [of New York], 7 App.Div. 128 [40 N.Y.S. 81 (1896)]). The legal meaning of the contract is always the *706 responsibility of the court and not of the engineers.'

"Id. at 117-118, 276 N.Y.S.2d 479, (emphasis added).
"Even Savin Bros. Inc. v. State of New York, 62 A.D.2d 511, 405 N.Y.S.2d 516 [(1978)], aff'd on op. below, 47 N.Y.2d 934, 419 N.Y.S.2d 969, 393 N.E.2d 1041 [ (1979) ], upon which the dissent partially relies to support its argument that the instant dispute resolution clause conclusively determined plaintiff's claims and bars the within action, also reiterated the now well established rule that while
"`the parties are free to leave certain determinations to the judgment of the engineer and, where this has been done, the determination of the engineer is final as a matter of law, absent a showing of fraud or bad faith [citations omitted] .... the contractor is not bound by the engineer's erroneous construction of law in interpreting the contract (Smith Contr. Co. v. City of New York, supra, [240 N.Y. 491, 148 N.E. 655 (1925);] Daniels Co. v. City of New York, supra [196 App.Div. 856, 188 N.Y.S. 716 (1921);] Burke v. Mayor, etc. of City of N.Y., 7 App.Div. 128 [40 N.Y.S. 81 (1896)])'
"Id. at 516, 405 N.Y.S.2d 516.
"This exclusion which preserves for the judicial forum issues involving questions of law can hardly be said to undermine the specific purposes underlying these clauses and, indeed, is responsive to a problematic factor in having an engineer or architect make legal determinations. As one commentator has observed:
"`The whole purpose behind courts allowing contracts to make architect's decisions final at all is to allow experts to protect the owner who lacks expertise in the field. Architects having no particular legal expertise, the courts should be willing to review their legal conclusions made on points not concerned with the quality or nature of the work required [citation omitted]. Compare this with the case of an arbitrator, whose expertise, if not strictly legal, is certainly in the area of settlement of disputes. It should go without saying that when the reason for the rule ceases, the rule also ceases, and experts are therefore not entitled to conclusive deference outside the areas of their expertise [citation omitted].'
"Corbin, Contracts, 1984 Supplement, by Colin K. Kaufman, Part I, § 652, pp. 790-791."
138 A.D.2d at 142-44, 530 N.Y.S.2d at 781-83 (emphasis added in Crimmins I).
The Appellate Division then applied that historical perspective to distinguish the case of Maross Construction Inc. v. Central New York Regional Transportation Authority, 66 N.Y.2d 341, 497 N.Y.S.2d 321, 488 N.E.2d 67 (1985), a case that "squarely presented the court with what it concluded was a `broad arbitration clause.'" 138 A.D.2d at 145, 530 N.Y.S.2d at 783. Among the differences the Appellate Division noted between the circumstances in Crimmins I and those in Maross were that the dispute-resolution provision in Maross applied to "all parties" rather than only to the contractor and applied "`to decide all questions of any nature whatsoever arising out of, under or in connection with, or in any way related to or on account of this Contract,' " 138 A.D.2d at 145, 530 N.Y.S.2d at 783-84, including legal claims such as fraud or misrepresentation. The Appellate Division also noted that Maross involved a contract between public corporations and that the contract vested in the architect the power to resolve legal *707 claims, a power not specifically accorded the engineer in Crimmins I. The Appellate Division therefore affirmed the trial court's judgment holding that the dispute-resolution provision in Crimmins I did bar the contractor's action. The City appealed to the New York Court of Appeals, the highest appellate court of that state.
The Court of Appeals also rejected the City's argument and set out the critical point that to be effective an alternative-dispute-resolution provision, like an arbitration provision, must explicitly bar the subcontractor's right to resort to the courts.
"An alternate dispute resolution agreement, like an arbitration agreement, `must be clear, explicit and unequivocal * * * and must not depend upon implication or subtlety'. (Matter of Waldron [Goddess], 61 N.Y.2d 181, 183-184, 473 N.Y.S.2d 136, 461 N.E.2d 273 [(1984)].) As we recognized in Matter of Marlene Indus. Corp. (Carnac Textiles), 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239 [(1978)], parties consenting to arbitration surrender many of their `normal rights under the procedural and substantive law of the State, and it would be unfair to infer such a significant waiver on the basis of anything less than a clear indication of intent'. (Id., at 334, 408 N.Y.S.2d 410, 380 N.E.2d 239.) The requirement of explicit and unequivocal agreement when there is to be mutually binding arbitration before a neutral arbitrator obviously takes on even greater significance when resolution of all disputes is to take place before the employee of one contracting party, and bind only the other. That standard has not been met.
"Clauses identical to article 24 have been found in City contracts for more than a century (see, e.g., O'Brien v. Mayor of City of N.Y., 139 N.Y. 543, 35 N.E. 323 [(1893)]). That language traditionally was read as conferring upon the designated individualstypically architects or engineersthe power to make binding decisions as to factual disputes that fell within their particular expertise, but excluding legal matters of contract interpretation (see, O'Brien v. Mayor of City of N.Y., supra; Smith Contr. Co. v. City of New York, 240 N.Y. 491, 496, 148 N.E. 655; Joseph Davis, Inc. v. Merritt-Chapman & Scott Corp., 27 A.D.2d 114, 117-118, 276 N.Y.S.2d 479 [ (1967) ]; but see, Maross Constr. v. Central N.Y. Regional Transp. Auth., 66 N.Y.2d 341, 344, 497 N.Y.S.2d 321, 488 N.E.2d 67 [ (1985) ], where clause specifically provided for resolution of `claims in the nature of breach of contract or fraud or misrepresentation').
"That this has been the meaning assigned to a standard clause found in public works projects since the last century is, at the least, significant in assessing whether the parties here intended that the clause would commit plaintiff to be bound by the chief engineer's decisions not only on the customary matters within his expertise, such as measurement, quantity and quality of materials, and classification or amount of work performed, but also by his interpretation of legal matters under the contract. Even the Citythe drafter of the contract for more than five years after commencement of this litigation apparently did not regard article 24 as anything more than such a standard clause."
74 N.Y.2d at 171-72, 542 N.E.2d at 1099-1100.
The Court of Appeals also examined the dispute-resolution provision in Crimmins II in the context of the entire contract; it noted that "many of the provisions in ... the contract would be rendered meaningless or useless were we to accept the City's *708 reading of [the dispute-resolution provision]." 74 N.Y.2d at 172, 542 N.E.2d at 1100. The Court of Appeals concluded that "[a] natural and unstrained reading of [the contract's] provisions indicates that both parties contemplated that the courts would have jurisdiction of a breach of contract claim made by the contractor." 74 N.Y.2d at 173, 542 N.E.2d at 1100.
The caselaw of Alabama, like the caselaw discussed in Crimmins I and Crimmins II, requires that an agreement to arbitrate be plainly expressed in the contract between the parties. Homes of Legend, supra, and Ex parte Stallings & Sons, Inc., 670 So.2d 861 (Ala.1995). Although Alabama's history regarding the construction of contractual provisions vesting decisionmaking authority in technicians such as an engineer or architect is more limited than is the history discussed in Crimmins I, it does offer some parallels. That is, this Court has recognized that such provisions may appropriately vest final authority to determine facts in a third party with technical expertise, but such an agreement ordinarily does not displace the authority of the courts to decide legal questions. In Alabama Chemical Co. v. International Agriculteral Corp., 215 Ala. 381, 110 So. 614 (1926), the Court considered a dispute on a contract governing the sale of phosphate rock used to manufacture commercial fertilizer. The plaintiffs sought to enforce payment for their delivery of the phosphate rock, and the defendants refused payment on the ground that the rock lacked the required phosphate content. Critical to the Court's consideration was a provision in the contract providing that pricing was to be determined by the mean between the chemical analyses performed by the chemist working for the plaintiff and the chemist working for the defendant. The contract further provided that in the event the analyses varied by more than one percent, a "referee" was to make an analysis, "and the mean of the two nearest of the three results obtained shall be accepted as final," 215 Ala. at 382, 110 So. at 615, for purposes of determining the contract price. The Court discussed the legal effect of the provision as follows:
"Such provisions are within the power of the parties to contract. Where the contract expressly declares, or clearly imports an intention, that the decision of the chosen agency shall be final, it is final as other terms of the contract and subject to be avoided on similar grounds; not technically an arbitration to settle dispute already arisen, but to forestall disputes, and to have the aid of expert knowledge in the conduct of a business requiring it. Mere mistake or error in the decision of the umpire does not avoid it; if so, the purpose of the stipulation would fail, the right of contract denied, and the chosen means of avoiding controversy made the breeder of litigation. The importance of such provisions in the conduct of many lines of present day business demands that they be annulled only upon substantial and well-established legal grounds.
"Like other transactions, the decision of the referee may be assailed for fraud. A report known by him to be false, working substantial injury to a party relying thereon, is a fraud. In assuming the duties of referee an element of trust is present. Hence, such flagrant disregard of duty as results in a decision not expressive of an honest judgment is a decision in bad faith, tantamount to a fraud. A gross error or mistake, working injury to a party, is evidential matter from which bad faith may be inferred or implied. The gravamen of the charge is bad faith, failure to form or express an honest judgment, with consequent injury. Abercrombie & Williams v. Vandiver, 126 Ala. 513, 28 So. 491 [ (1900) ]; *709 Central of Ga. R. Co. v. Isbell, 198 Ala. 469, 73 So. 648 [ (1916) ]; Catanzano v. Jackson, 198 Ala. 302, 73 So. 510 [(1916) ]; Shriner v. Craft, 166 Ala. 146, 51 So. 884, 28 L.R.A.(N.S.) 450, 139 Am. St.Rep. 19 [ (1909) ]; Martinsburg v. March, 114 U.S. 549, 5 S.Ct. 1035, 29 L.Ed. 255 [ (1885) ]; Brooke v. Laurens Milling Co., 78 S.C. 200, 58 S.E. 806, 125 Am.St.Rep. 780 [ (1907) ]; 23 R.C.L. p. 1363, § 185; 6 R.C.L. p. 956, § 335."
215 Ala. at 383, 110 So. at 615-16 (emphasis added). Thus, the Court in Alabama Chemical recognized that contracts could properly provide that technical experts might supply final determinations of facts within their area of expertise without the resulting determination being an "arbitration to settle disputes."
In Shriner v. Craft, 166 Ala. 146, 150, 51 So. 884, 888 (1909),[3] the Court considered a dispute over the construction of buildings in Mobile in which the construction contract provided that the certificate of an architect would be conclusive as to particular expenditures. As it did in Alabama Chemical, the Court in Shriner recognized that the factual determination of the architect as to a matter within his area of expertise could have a final legal effect on the parties. However, the Court also noted that the contract was subject to invalidation based upon legal actions, such as fraud or bad faith; no inference is to be made from Shriner that the Court in that case was prepared to construe the contractual provision governing the architect's certificate as a means of arbitrating disputes.
Although the historical perspective in this state of provisions analogous to paragraph 5.01 is not as extensive as that discussed in Crimmins I and Crimmins II, our caselaw has recognized that such provisions are appropriate to allow the decisionmaker specified in the provision to make final determinations of fact as specified in the contract, but such provisions have not been applied to displace the authority of the Courts to resolve legal issues arising from the contract. The historical perspective provided by cases construing such provisions does not, therefore, favor the Board's argument that paragraph 5.01 is an arbitration agreement. The Board argues that Ruby-Collins, Inc. v. City of Huntsville, 748 F.2d 573 (11th Cir.1984), presents a situation in which a provision similar to paragraph 5.01 has been construed to be an arbitration agreement. In Ruby-Collins, the United States Court of Appeals for the Eleventh Circuit held that a provision in a public-works contract that provided that all claims between the owner and the contractor would be presented to the designated engineer for a final and binding decision was properly construed to be an arbitration provision. However, unlike the case before us, the contract at issue in Ruby-Collins did expressly provide that arbitration would be a remedy. Further, the contact provision in Ruby-Collins, after specifying that the engineer would have similar decisionmaking authority to the Engineer in paragraph 5.01 of this case, specified:
"All claims of the Owner or the Contractor shall be presented to the Engineer for his decisions which shall be final except in cases where time and/or financial considerations are involved, and such cases shall be subject to arbitration *710 if not solved by mutual agreement between the Owner and the Contractor."
748 F.2d at 577 (emphasis added). This portion of the contract in Ruby-Collins makes it clear that the parties in that case did not intend for the engineer to be an arbitrator.
The contracts in the instant case do not expressly provide for arbitration. Our review of the history of the construction and the application of provisions analogous to paragraph 5.01, both in this state and as discussed by the New York courts in Crimmins I and Crimmins II, persuades us that such provisions are not ordinarily construed to require the arbitration urged by the Board. Further, the standard specifications also include section 7, titled "Legal Relations and Responsibility to Public," which contains a number of provisions discussing the responsibilities of the contractor, its surety, and the owner concerning legal actions (paragraph 7.10), discussing the legal liability of the Engineer and public officials specified in the contract (paragraph 7.15), and disclaiming any waiver of legal rights (paragraph 7.16). Further, paragraph 8.19 of the standard specifications provides that acceptance of final payment acts as a release of all legal claims. It is apparent that a construction of paragraph 5.01 as providing that the Engineer is vested with the authority to finally arbitrate all legal claims would effectively invalidate those provisions. The law is settled that this Court is bound to construe contracts so as to give meaning to all provisions whenever possible.
"Terms of a written instrument should be construed in pari materia and a construction adopted that gives effect to all terms used. Inconsistent parts in a contract are to be reconciled, if susceptible of reconciliation; however, if that is not possible, any doubt will be resolved in favor of the first part, considering the instrument as a whole."
Sullivan, Long & Hagerty v. Southern Elec. Generating Co., 667 So.2d 722, 725 (Ala.1995) (citations omitted). See also Winkleblack v. Murphy, 811 So.2d 521 (Ala.2001); Scherf v. Renfroe, 266 Ala. 35, 39, 93 So.2d 402 (Ala.1957). The construction of paragraph 5.01 urged by the Board fails this test; the construction recommended by the special master and adopted by the trial court effectuates this purpose. Accordingly, the judgment of the trial court denying the Board's arbitration motions is affirmed.
AFFIRMED.
HOUSTON, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
SEE and LYONS, JJ., dissent.
LYONS, Justice (dissenting).
The trial court failed to consider the threshold issue of the applicability of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("the FAA"). I consider this omission material because § 5 of the standard specifications entitled "control of work" describes the authority of the engineer as including the right to decide any and all questions that arise concerning "the acceptable fulfillment of the Contract on the part of the Contractor."
If the FAA applies, I cannot accept the analysis in the majority opinion on principles of state law that concludes that the engineer's authority is not broad enough to decide questions concerning performance of the contract. This is so because, if the FAA applies, ambiguities as to the scope of the arbitration clause must be resolved in favor of arbitration. See Volt Info. Sciences, Inc. v. Board of Trustees of Leland *711 Stanford Junior Univ., 489 U.S. 468, 475-76, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).
I would therefore reverse the order denying arbitration and remand this proceeding for the trial court to make a threshold determination as to the applicability of the FAA. If the FAA is applicable, then this matter should be submitted to arbitration.
SEE, J., concurs.
NOTES
[1] As discussed later in this opinion, the Board argues that the Engineer's decision was effectively an arbitration.
[2] During the time span relevant to this case, BCM has changed names and ownership because of acquisitions and circumstances not relevant to this case. For ease of reference, BCM and the various entities that succeeded it are referred to herein simply as "BCM."
[3] We note that this case was resolved before the enactment of Ala.Code 1975, § 8-1-41, providing that an agreement to submit a controversy to arbitration could not be specifically enforced. That statute has been preempted by the Federal Arbitration Act, 9 U.S.C. § 2, with respect to contracts governing transactions substantially affecting interstate commerce. Potts v. Baptist Health Sys., Inc., 853 So.2d 194 (Ala.2002).